WOO WAI et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   May 3, 1915.)

No. 2507.

1. CRIMINAL LAW ☜37—ENTRAPPING ONE TO COMMIT AN OFFENSE—EFFECT.
    The fact that a detective or other person, suspecting that accused is
    about to commit a crime, prepares for his detection, as a result of which
    he is entrapped in the commission of the crime, is no excuse, where ac-
    cused alone conceived the original criminal design.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 42; Dec.
    Dig. ☜37.]

2. CONSPIRACY ☜28—CRIMINAL RESPONSIBILITY—STATUTORY PROVISIONS.
    Where it was the intention of United States officers, who induced de-
    fendants to attempt to bring Chinese persons across the Mexican border,
    that the law should not be violated, and that they would prevent the con-
    summation of the offense which they lured defendants to undertake, by
    intercepting the Chinese so brought across the border and returning them
    to Mexico, defendants, though not aware of the fact, were not guilty of
    a conspiracy to commit a criminal act, punishable by Rev. St. U. S. §
    5440, merely because they engaged in the act, which was not to result in
    an accomplished offense against the United States.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec.
    Dig. ☜28.]

3. CRIMINAL LAW ☜37—ACTS OF OFFICERS INDUCING CRIMINAL ACTS—EF-
   FECT.
    Where government officers induced defendants to commit a criminal act
    not contemplated by them, and the purpose of the government officers
    was not to secure the punishment of any of them, but to place one of
    them in a position where he might be compelled to disclose facts of which
    he was suspected of having knowledge not derived from unlawful acts
    of his own, but relating only to unlawful acts of others, a conviction of
    defendants was contrary to public policy.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 42; Dec.
    Dig. ☜37.]

In Error to the District Court of the United States for the South-
ern Division of the Southern District of California; William C. Van
Fleet, Judge.

Woo Wai and others were convicted of conspiracy to bring into the
United States Chinese persons, and they bring error.   Reversed and
remanded for new trial.

Denis & Loewenthal, of Los Angeles, Cal., and C. H. Sooy, David
L. Levy, and J. C. Campbell, Weaver, Shelton & Levy, all of San
Francisco, Cal., for plaintiffs in error.

Albert Schoonover, U. S. Atty., and Harry R. Archbald, Asst. U.
S. Atty., both of Los Angeles, Cal., for the United States.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge:   The plaintiffs in error were convicted
under an indictment which charged them with conspiring to bring into
the United States from Mexico certain Chinese persons who were not
entitled to enter or remain in the United States.   The defense on which
the defendants relied upon the trial was that they had been lured by

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

government officers into the commission of a seeming violation of the laws of the United States, and that therefore they had committed no offense against those laws. Upon the efficacy of that defense the trial court charged the jury that, if they found the facts to be fully as testified by the defendants, those facts would constitute no legal or valid defense in law to the charge embraced in the indictment. That instruction is assigned as error.

The facts testified to by the defendants, and so referred to in the charge, together with the facts established by the prosecution, are the following: In October, 1908, Fernando Sanford, a confidential agent of the Immigration Commission then in charge of the investigation of offenses in violation of the immigration laws on the Pacific Coast, suspected that Woo Wai, a Chinese merchant who had resided for many years in San Francisco, possessed information in regard to previous unlawful importations of Chinese women into San Francisco, and the complicity therein of certain officers of the Immigration Commission. He conceived the scheme of obtaining a hold on Woo Wai, in order to make him tell what he knew, by luring him into the commission of an offense against the laws of the United States, by bringing Chinese across the Mexican border into California, for which he was thereafter to be indicted and convicted, all for the purpose of bringing pressure to bear upon him to make him "come through," or, as was testified by one of the immigration officers:

"He wanted to get this man, as it were, in the door, so that the man would have to give him the information."

To carry out this scheme, Sanford, at the expense of the United States, employed a detective. The detective, whose name was Roy, approached Woo Wai, and suggested to him that he knew a scheme by which they could make money. Without disclosing the nature of the scheme, Roy induced Woo Wai to accompany him to San Diego. Both the expenses of Woo Wai and Roy on that journey were paid out of the treasury of the United States. Roy introduced Woo Wai to the local inspectors of immigration at San Diego, Ralph L. Conklin and Harry H. Weddle. Sanford had informed these inspectors of the nature of the scheme. It is to be said in justice to the inspectors that they entered into the scheme with great reluctance. In their presence and in the presence of Woo Wai, Roy made the proposition that they permit Woo Wai to bring Chinese across the Mexican border, for which they should receive $50 a head. They assented, but Woo Wai said:

"This is in violation of the law. It could not be done."

The inspectors said:

"Oh, well, if we make no arrest, who can make arrest? And then we don't want to go to jail. You don't want to go to jail, and if you go to jail, we will go to jail."

After returning to San Francisco, Roy again urged Woo Wai to carry out the scheme and to engage some other Chinese to assist him in it, and Sanford wrote Conklin as follows:

"Dear Conklin: I have seen our friend since his return, and I think we will make matters all right yet. * * * I will stand the responsibility of your letting another man through, if necessary. Use him yourself for all he is worth."

Woo Wai, accompanied by his partner, Wong Chung, and Woo Mon Yin, again went to San Diego and had an interview with Conklin and Weddle, and again Woo Wai and his partner returned to San Francisco, for the reason, as Woo Wai testified, that he did not like to handle this kind of work. During the summer of 1909 Roy was again urging Woo Wai to go to San Diego and enter into the scheme which had been devised, and Conklin wrote him several letters for the same purpose. The inspectors explained to Woo Wai the means by which Chinese could be brought across the border, the routes which they should follow, and the methods by which they could avoid arrest. Conklin went so far as to go to San Francisco to interview Woo Wai. It was not until about April 1, 1910, that Woo Wai finally assented to enter into the scheme which had been so assiduously and persistently urged upon him. He engaged his codefendants, Wong Chung and Wong Yee, to assist him.

[1] The general rule in regard to entrapment is expressed in 12 Cyc. 160:

"The fact that a detective or other person suspected that the defendant was about to commit a crime, and prepared for his detection, as a result of which he was entrapped in its commission, is no excuse, if the defendant alone conceived the original criminal design."

In the case at bar there is no evidence that, prior to the time when the detective first approached Woo Wai, any of the defendants had ever been engaged in the unlawful importation of Chinese, or had ever committed or thought of committing any offense against the immigration laws. The purpose for which the detective was employed, and the object of the scheme of entrapment, was not to punish men who were suspected of crime; but the whole purpose was to place Woo Wai in a position where he might be compelled to disclose facts of which he was suspected to have knowledge, knowledge not shown to be derived from unlawful acts of his own, but which related only to the unlawful acts of other persons—certain officers of the Immigration Commission at San Francisco. The scheme could not be carried out at San Francisco, the place where Woo Wai resided. It must necessarily be staged at a place where Chinese could be brought across the border, so they took him to San Diego, more than 500 miles away, and there coaxed, persuaded, and urged him into the commission of the acts upon which the indictment was based, at the same time promising him the protection of the officers of the United States.

[2] There are two grounds on which we think the judgment should be reversed:

First. The facts as testified to by the defendants, and as supplemented by the evidence for the United States, fall short of showing that there was in fact a conspiracy to commit a criminal act within the meaning of section 5440. It was the intention of the officers who induced Woo Wai and his associates to attempt to bring Chinese across

the Mexican border that the law should not be violated. They intended to prevent the consummation of the offense which they lured the defendants to undertake. Their purpose was to intercept the Chinese so brought across the border, and return them to the country whence they came. Woo Wai and his associates, therefore, although they were not aware of that fact, were engaged in an act which was not to result in an accomplished offense against the laws of the United States. In State v. Douglass, 44 Kan. 618, 625, 26 Pac. 476, 478, the court said:

"Where a thing is not an offense at all, a party cannot be guilty of committing an offense by merely consenting thereto; and even where the thing is an offense, a party can be guilty of committing an offense by consenting thereto only where his consent is of that affirmative and expressed character which amounts to a counseling, aiding, or abetting in the commission of the offense."

If no violation of the law was to be accomplished by the act of the defendants, it follows that they could not be held for conspiracy to do that act. In Connor v. People, 18 Colo. 373, 33 Pac. 159, 25 L. R. A. 341, 36 Am. St. Rep. 295, the offense charged was a conspiracy to rob a train. The conspiracy was originated by a detective employed by the railroad company. He induced the defendant to participate in it. The court held, following the settled rule on that subject, that, since the railroad company assented to the robbery, there was no trespass and no larceny. In answer to the contention that it was not for larceny, but for conspiracy, that the defendant was indicted, the court held that, inasmuch as the act done would constitute no crime, there could be no prosecution for a conspiracy to commit the act, citing Johnson v. State, 3 Tex. App. 593.

[3] Second. We are of the opinion that it is against public policy to sustain a conviction obtained in the manner which is disclosed by the evidence in this case, taking the testimony of the defendants to be true, and that a sound public policy can be upheld only by denying the criminality of those who are thus induced to commit acts which infringe the letter of the criminal statutes. Some of the courts have gone far in sustaining convictions of crimes induced by detectives and by state officers. This is notably so of the decision in People v. Mills, 178 N. Y. 274, 70 N. E. 786, 67 L. R. A. 131. But it is to be said, by way of distinguishing such cases from the case at bar, that in all of those cases the criminal intention to commit the offense had its origin in the mind of the defendant. Thus in People v. Mills, it was the defendant who made the first suggestion looking toward the commission of the criminal act, and for the commission of that act the district attorney furnished him opportunity and lent him aid. In the case at bar, the suggestion of the criminal act came from the officers of the government. The whole scheme originated with them. In O'Brien v. State, 6 Tex. App. 665, the court said that a case is not within the spirit of the Criminal Code where an officer "originates the * * * intent, and apparently joins the defendant in the criminal act first suggested by the officer, merely to entrap the defendant." In Commonwealth v. Bickings, 12 Pa. Dist. R. 206, it was said:

"No state, therefore, can safely adopt a policy by which crime is to be artificially propagated. * * * This is virtually the case of a detective who, by promising to perpetrate a crime, lures an innocent man to aid and abet him, the object being, not the perpetration of the crime, but the luring of the abettor."

In Love v. People, 160 Ill. 501, 43 N. E. 710, 32 L. R. A. 139, the court said:

"It is safer law and sounder morals to hold that, where an owner arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act and others to be led into and encouraged in its commission by acting in concert with such owner, no crime is thus committed."

In Commonwealth v. Wasson, 42 Pa. Super. Ct. 38, it was said:

"In considering the question of public policy the clear distinction, founded on principle as well as authority, is to be observed between measures used to entrap a person into crime in order, by making him a criminal, to aid the instigator in the accomplishment of some corrupt private purpose of his own, and artifice used to detect persons suspected of being engaged in criminal practices, particularly if such criminal practices vitally affect the public welfare rather than individuals."

In Saunders v. People, 38 Mich. 218, Judge Marston said:

"Some courts have gone a great way in giving encouragement to detectives, in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing."

In People v. McCord, 76 Mich. 200, 42 N. W. 1106, Judge Campbell said:

"But our duty to public justice and decency requires us to dispose of the other views of the case. In some of its features it is one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime in order to get him convicted that has ever been before us. If the prisoner's statement is believed, and the court in the latter part of the charge seems to have assumed it was probable, he was not the active agent in the crime, but guilty of aiding and abetting Flint, and therefore only guilty if Flint was guilty. It would be absurd to hold Flint guilty of burglary. He did what he was expected to do, and had no such intent as would hold him responsible. It may be true that a person does not lose the character of an injured party by merely waiting and watching for expected developments. Possibly—but we do not care to decide this—leaving temptation in the way without further inducement will not destroy the guilt in law of the person tempted, although it is a diabolical business, which, if not punishable, probably ought to be."

Many other courts have expressed similar views, even while, in some instances, upholding the conviction obtained by the methods which were criticized.

The judgment is reversed, and the cause remanded for a new trial.