SAM YICK et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   March 19, 1917.)

No. 2542.

1. CRIMINAL LAW ⬅️37—PUNISHABLE OFFENSES—CRIMINAL ACTS INDUCED BY GOVERNMENT OFFICERS.
    While the mere aiding of one in the commission of a criminal act by a government officer or agent may not preclude the conviction of the person committing the crime, where the officers of the law have incited the person to commit the crime charged, and lured him on to its consummation with the purpose of arresting him in its commission, the law will not authorize a verdict of guilty.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 42.]

2. CRIMINAL LAW ⬅️844(2)—TRIAL—SUFFICIENCY OF EXCEPTIONS TO INSTRUCTIONS.
    Exceptions to the charge of the court in a criminal case held sufficiently specific to direct the court's attention to the particular point objected to when taken in connection with an instruction requested by defendants and refused.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2025.]

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Olin Wellborn, Judge.

Criminal prosecution by the United States against Sam Yick and Jung Kim, alias Junk Chung. Judgment of conviction, and defendants bring error. Reversed.

Mott & Dillon and Isidore B. Dockweiler, all of Los Angeles, Cal. (Thomas A. J. Dockweiler and G. C. O'Connell, both of Los Angeles, Cal., of counsel), for plaintiffs in error.

Albert Schoonover, U. S. Atty., and J. Robert O'Connor and Clyde Moody, Asst. U. S. Attys., all of Los Angeles, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The plaintiffs in error were convicted under an indictment charging them with the crime of conspiracy, in that they did on the 24th day of August, 1911, within the county of Kern, in the Southern district of California, willfully, unlawfully, and feloniously conspire and agree, together with divers other persons to the grand jurors unknown, to unlawfully bring and cause to be brought into the United States from divers places in the republic of Mexico "certain Chinese persons, to wit, Dock Yook, See Chew, and Wah Sung, each being a Chinese person, and any and all other and additional Chinese persons who were then and those who would thereafter be in said republic of Mexico, desiring and intending to enter the United States," none of whom being entitled under the laws of the United States to enter this country. The indictment also set out certain alleged overt acts of one of the alleged conspirators, consisting of the purchase of a certain railway ticket by him in pursuance of the conspiracy for his transportation from Bakersfield to the city of San Diego, and in further pursuance of the alleged conspiracy his leaving that city for the

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

town of Tia Juana, Mexico, for the purpose of arranging to bring three certain named Chinese persons across the international boundary into the United States.

It appears from the evidence introduced on the trial by the government that one Morse was its local inspector of immigration at Bakersfield during the times in question, having gone there in that capacity about the 1st of January, 1911, and that in the performance of his duties he had frequent occasion to see the defendant Sam Yick (whom he speaks of in his testimony as the principal Chinaman in that vicinity) in regard to Chinamen in and around Bakersfield; that on the 8th day of May, 1911, he had a talk with Sam Yick in reference to smuggling Chinese into this country, having gone to Yick's store to inquire about a Chinaman named Woo Jung Sing; that Yick told him he knew the Chinaman, and that he was on a ranch about five miles out of Bakersfield, and that he would take the inspector out to see him, as he wanted to have a talk with the latter anyway; that Yick did so the afternoon of the same day. We insert the following from the testimony of the inspector in regard to that trip:

"On the way out he asked me what salary I was getting, and whether I had a family to support, and if I could save any money off the salary I was getting, and if I had any opportunity to make money on the side, and how much money I made on the side; but I answered, rather shortly, I didn't consider it any of his business, and for the time being the subject was dropped. Then I went out there and examined this man, and on the way back he brought up the matter again, and he asked me if I didn't want to make more money than I was making, and I asked him how he meant. Well, he said that I arrested a good many Chinese around Bakersfield, and that if I would bring those Chinese in his store, instead of taking them to jail, he would pay me $100 for each one brought there, if I would release them. I asked him who would pay the money, and he said he would individually. Well, he said these Chinese would pay the money back to him, and he would charge them interest. He would make something off it, and I would make $100. I told him I would consider it. Then he said, if I wanted to make more money than that, if I could prepare papers for some Chinese that were in Mexico, so as to enable them to get to Bakersfield, he would be able to give me a good deal of business in that line, and I asked him where the Chinese would come from. Well, he said he had some friends in Juarez, Mexico, that wanted to come to Bakersfield; that he had letters from them in reference to coming here, and he wanted to know if I couldn't prepare papers purporting to show that these men were native-born citizens of the United States that would allow them to pass the inspectors on the way. He asked me how many inspectors there were between El Paso and Bakersfield, and I told him there were a great many located along the way, and he said I understood about making these papers, and ought to be able to make a paper that would pass inspection down there; and I told him it would be pretty hard to do, but I would see what I could determine on it—see what could be done; and then he said it was so hard to bring them from Juarez that the best proposition would be to bring them in from down at Tia Juana, from Ensenada; that there was a lot of Chinese there that would come. Prior to this I had asked him, or he had told me, how much there would be in it for these Chinese in Juarez. He said there were two or three there that he knew would come, and probably more would come if they could; and he said, if I could fix up these papers so that they would pass, I would get $150 for each paper; and he said it would be easier to get them in from Ensenada, if it looked good to me, and I wanted to accept money that way, that he would bring in a good many Chinese from Ensenada, that he would write down immediately and see how many there were there, that he knew of several that would come

and he knew there were a good many more, and that if I could get the Chinese in from Ensenada and bring them to Bakersfield and pay for them he would pay me $250 for each Chinese so brought in; and I told him I had never drawn up any papers of that sort, and would have to get some data as to the best way to draw them up, and so forth, and he asked me if I couldn't use my seal. He supposed that I had a seal similar to the commissioner's seal.".

That testimony clearly tended to show an attempt by Sam Yick to bribe the inspector. The record further shows that on the same day, May 8th, Morse reported the matter to his superior officer at Los Angeles, who, after consultation with the then Assistant United States Attorney there, instructed Morse "to go ahead and try to apprehend him (Sam Yick) by going in with him"; that the next conversation that Morse had with Yick was in the store of the latter in Bakersfield about 9 o'clock in the evening of May 17th, in response to the request of Sam Yick, which is thus stated by Morse in his testimony:

"Mr. Giddings went to Sam Yick's store with me on the night of May 17th and stayed outside the store. I went into the store and saw Sam Yick. He took me to a room in the rear of the store and asked me if I had not been able to prepare any papers by that time. I told him that I had not done anything on it up to that time, that I had been busy; and he said that he had thought the matter over and concluded that he could make a good deal of money by going into the business, that he had already written to Ensenada to make arrangements for the Chinamen to come from there, and that he had in mind in particular four whom he knew would be glad to come right away, and that $250 apiece would be available for these four as soon as they arrived here at Bakersfield, and he asked me if I would be able to have the papers prepared for them by the time they got to Bakersfield. I told him that I did not know for certain. He told me to go to work and get the papers ready as soon as I could, because the men would be ready to come over at any time; he said I would not be expected to assist in getting the men over, that he would look out for that end of it altogether; but he said that he would expect me to get the men past the immigration officers on the way. He asked me who inspected the trains at San Diego, and if I knew some way I could get the men past the inspecting officer there, and he asked me if I couldn't get the inspecting officer at San Diego to go in with me on the proposition; he said that if I got $200 I could afford to give him (the inspecting officer at San Diego) $50, and if I got $250, I could afford to keep $200 and give this other man $50. I told him that I thought, perhaps, it could be arranged that way; he then told me that he would send a man down to San Diego to carry these men to Bakersfield, and he suggested that I should have the inspector in San Diego come up to Bakersfield and meet the man who was to go down to guide the Chinese coming across, so that the San Diego inspector would know him in case he saw him with the Chinese and would not arrest them. He said that he had written for the photographs of the four Chinese that were to come over, and he was expecting to hear from them at any time, and as soon as he heard from them he would let me know. Mr. Giddings is the man in whose house I was living in at Bakersfield at the time, and during this conversation I had with Sam Yick at his store Mr. Giddings was right across the street from the store; he walked from his house down to the store with me."

The next conversation Morse had, according to his testimony, with Yick, was in the evening of August 10th, in the back room of the latter's store, in which conversation, according to the testimony of the witness, Yick said he had heard from Ensenada two or three times since he had last seen the witness, and had received the photographs of

four Chinese, who he said were ready to come as soon as they could get the papers prepared for them, and asked the witness whether he had made arrangements with the inspector at San Diego to pass them when they were brought to that city. "And at that time," said the witness, "he told me who was going to be the guide, who would go down after them. He said that Jung Kim would. Jung Kim was his partner in the store there, and I was acquainted with him. And he showed me the photographs of these four Chinese, and told me to prepare the papers as soon as possible. I told him I didn't think it would hardly—that I couldn't prepare the papers right here, that arrangements were not made, and that if they expected to bring their Chinese up right away they could bring them up, and I would see to preparing the papers later on. He said they would have to have some means of identification; and in talking it over it was decided that the photographs would be used as a means of identification, and that the names of these Chinese would be written on the photographs. But he said, before he went any further, he would have to talk with another man, and see whether or not they would want to bring them in before they had their papers; and he said to come and see him a couple of nights after that, and he would know whether he wanted to go in on that proposition, or wait until the papers were prepared."

The next conversation had by Morse, according to his testimony, with Yick, was held at his store in the evening of August 12, 1911, and in relating that conversation the witness testified, among other things, as follows:

"At this conversation on August 12th Sam Yick also asked me to make arrangements to have the inspector from San Diego come to Bakersfield to make final arrangements for bringing the Chinese over. Afterwards, on the 24th of August, Mr. A. G. Bernard, the inspector at San Diego, came to Bakersfield. After his arrival, at 8 o'clock in the evening of August 24th, Mr. Bernard and I went to Sam Yick's store; at first only Bernard, Sam Yick, and myself were present, and all that was said at first was to introduce Bernard to Sam Yick. Very shortly afterwards the defendant Jung Kim came in. Thereupon Sam Yick introduced Mr. Bernard to Jung Kim, and told Mr. Bernard that Jung Kim was the man he was going to send down, and he pointed out to him that one way of recognizing Jung Kim again was by reason of the fact that he had a double thumb on his right hand. Sam Yick then went on to say that, if ever it was necessary to send a message about the Chinese, they would be referred to as so many pieces of goods; he also questioned Mr. Bernard about the number of immigration officers in San Diego and how they did the inspection of trains, and how many inspectors there were between San Diego and Bakersfield. He also questioned Mr. Bernard in reference to where the soldiers were located at Tia Juana and below, between there and Ensenada, and asked if things were calm enough down there so that the Chinese could be brought through. He also inquired of Bernard the best way to bring in the Chinese, and if it was likely that any of the other inspectors would be around at the wrong time and arrest the Chinese, and in case of this happening if he (Bernard) would be able to get them out. He told Bernard that all arrangements were made with me, and that I would pay Bernard, and whatever he got he would get through me. At this conversation also, and while Mr. Bernard was there, Sam Yick stated that he didn't want to send photographs as a means of identification, as they were likely to get broken, and that it would be better to furnish some kind of an identification card to show who the Chinese were, instead of a photograph, and he said that he would write the names of the Chinese on a slip of paper in Chinese

characters and would have me write the names on the slips in English to show Mr. Bernard who they were; these slips were to be furnished in duplicate, the originals to be sent to Ensenada to the Chinese, and the duplicates to be sent to Inspector Bernard to be compared with the originals when the Chinese came over. Sam Yick said these slips would be brought to me at my house the next night. On the night of August 25th Sam Yick and Jung Kim came to my house. I was then rooming in Kern, on Baker street, what is now East Bakersfield, at Mr. Giddings' house. Before they came I had raised the window of my room about six inches and placed Mr. Giddings outside. It was probably about 8 o'clock in the evening when Sam Yick and Jung Kim came. They told me that they had written four cards in Chinese characters, and said that the names of the Chinese were Dock Yook, See Chew, Wah Sing, and Ah Sing. I took each piece of paper as they named them, and above the Chinese characters I wrote these same names in English, and put my initials underneath the Chinese characters; they only had the original slips, and these I returned to them after writing on them the names in English and my initials."

As has been seen, the indictment alleges the conspiracy to have been entered into on the 24th day of August, 1911, being the day on which Inspector Morse took Inspector Bernard to Yick's store, and at which time Yick introduced to them the plaintiff in error Jung Kim as "the man he was going to send down" to guide the Chinamen from Mexico into this country. If the testimony thus given on behalf of the government was true (a question, of course, for the determination of the jury), the officers of the law, instead of proceeding against the plaintiff in error Sam Yick for the attempted bribery of the inspector (with the best of motives, no doubt, but wrongly as we conceive), planned and induced him to enter into a scheme with them by which the Chinamen referred to in the indictment should be brought into the United States, and in the execution of which scheme so concocted they were, according to the evidence, so brought.

We see nothing in the foregoing testimony of Inspector Morse, nor, in any other evidence in the record, tending to show that the idea of a *conspiracy* originated with Sam Yick. Taking the testimony to be true, the crime he committed was the attempted bribery of the government inspector to prepare false papers for the admission of Chinese persons not entitled to enter the country; and the scheme which culminated in the conspiracy alleged in the indictment to have been formed on the 24th day of August, 1911, by the plaintiffs in error and other persons to the grand jurors unknown was, according to the evidence, devised by the officers of the law, and had its origin in the letter of Inspector Morse, of date May 8, 1911, to his superior officer. And it was so contended in the court below on behalf of the plaintiffs in error, and, further, that the plaintiff in error Jung Kim was not a conspirator, but a mere employé of Sam Yick in the transactions in question.

The first point here made on behalf of the plaintiffs in error is that the instruction of the court below in respect to the first of these matters was erroneous and prejudicial to them; and, in the view we take of the case, it is unnecessary to state any other point relied upon for a reversal of the judgment. The instruction referred to is as follows:

"The court further instructs you that the fact, if it be a fact, that government officers incited or aided defendants to commit the crime charged against them, if they did commit it, is no bar to a prosecution by the government.

The court further instructs you that persons engaged in a criminal conspiracy, such as here charged, may be held guilty of the crime, even though they were incited to it by government officers, or were acting in the belief that government officers or agents were co-operating with them, and notwithstanding the parties so engaged were depending upon such officers to protect them from arrest, and to aid in carrying out the objects of the conspiracy. If, therefore, you find from the evidence, beyond a reasonable doubt, that there was a conspiracy between the defendants, as alleged in the indictment, and that the defendant Jung Kim committed either of the overt acts therein charged, it will be your duty to find the defendants guilty, notwithstanding officers of the government participated, if they did participate, in any of the acts committed by defendants, or either of them."

[1] It is, of course, not a matter for this court to say what conclusion the jury would or should have drawn from the testimony tending to show that the alleged conspiracy was first suggested by the officers of the law, and that they lured the alleged conspirators on to commit the necessary overt act or acts and thus consummate the alleged crime; all of those matters being exclusively for the determination of the jury. And while it may be true that the mere aiding of one in the commission of a criminal act by a government officer or agent does not preclude the conviction of the party committing the crime, yet where the officers of the law have incited the party to commit the crime charged and lured him on to its consummation, the law will not authorize a verdict of guilty.

[2] The contention that the exception to the instruction was not sufficiently specific we think without merit. The distinct and only effect of it was to tell the jury that such inducement on the part of a government officer did not preclude the prosecution or conviction of the defendants. We are aware of the well-established rule that a general exception to a charge which does not direct the attention of the court to the particular portion or portions of it to which objection is made raises no question for review by the appellate court; the reason being that the attention of the trial court should be drawn to the portion or portions complained of, to enable the court to correct any error that it should find had been made. Indeed, rule 22 of the trial court in the instant case expressly provides:

"Rule 22. *Bills of Exceptions to Charge of Court, When and How Made.*— The party excepting to the charge of the court to the jury must specify distinctly the several matters of law in the charge to which he excepts. Such matters of law, only, will be inserted in the bill of exceptions, and allowed by the court. All exceptions to the charge of the court to the jury shall be specified in writing immediately on the conclusion of the charge, and handed to the court before the jury leave the box. The bill of exceptions must be prepared in form, and presented to the judge within ten days after verdict, and, in default thereof, the exceptions will be deemed waived."

Now, turning to the record, we find it expressly declared in the minutes of the court as follows:

"The requirements of rule 22 of practice of this court as to presentation of written exceptions to the judge's charge before the jury leave the box having been waived in open court by counsel for the respective parties, it is ordered that the instructions requested by defendants be and they are hereby refused, except in so far as the same may have been embodied in the instructions given by the court; and it is further ordered that exceptions be and

they hereby are noted herein to each and every of the instructions given by the court, and to the refusal of the court to give each and every of the instructions requested by defendants, which the court refused to give; whereupon, at the hour of 10:48 o'clock a. m., the jury retired to consider their verdict."

Among the instructions so requested and refused are the following:

"The jury is instructed that, if you find from the evidence that Inspector A. P. Morse and Inspector A. G. Bernard were accomplices or co-conspirators with the defendants in this case, their testimony ought to be viewed with distrust, and their evidence as to the oral admissions of the defendants in this case ought to be viewed with caution; and you are further instructed, even if you find from the evidence that Inspector A. P. Morse and Inspector A. G. Bernard were accomplices or co-conspirators with said defendants, a conviction cannot be had on their testimony alone, unless they are corroborated by other evidence, which in itself and without the aid of their evidence tends to connect the defendants with the commission of the offense charged in the indictment; and the corroboration is not sufficient for a conviction if it merely shows the commission of the offense or the circumstances thereof. Section 1111 of the California Penal Code; also section 2061, subdivision 4, of the California Code of Civil Procedure.

"No conspiracy can exist without at least two persons being conspirators therein. One person cannot constitute a conspiracy. Therefore, if you find from the evidence that the acts charged by the government in the indictment to have been committed by the defendant Jung Kim were performed by said defendant Jung Kim simply as an employé, servant, or agent of the defendant Sam Yick, and were performed by said defendant Jung Kim without any common design, purpose, or understanding on the part of said defendant Jung Kim and said defendant Sam Yick, then I instruct you that said defendant Jung Kim cannot be considered a conspirator with said defendant Sam Yick; and if you further find that the acts performed by Inspector A. P. Morse and Inspector A. G. Bernard were performed solely for the purpose of entrapping the defendants, and without any common design, purpose, or understanding with said defendant Sam Yick, or said defendant Jung Kim, and without any unlawful intent on the part of said Inspector A. P. Morse and said Inspector A. G. Bernard, then I instruct you that said Inspector A. P. Morse and said Inspector A. G. Bernard cannot be considered as co-conspirators with said defendant Sam Yick, and that it necessarily follows that the proof of the commission of the conspiracy alleged in the indictment is reduced to one person, to wit, Sam Yick, and that one person alone cannot form or constitute a conspiracy, even though you find that all of the acts charged in the indictment were done by the defendant, and you must return a verdict of acquittal as to both of the defendants. U. S. v. Newton [D. C.] 52 Fed. 275, at page 280 and page 286."

It is thus seen that the defendants requested the court to instruct the jury, among other things, that, if they should find that the government inspectors named in the testimony were accomplices or co-conspirators with the defendants, their testimony should be viewed with caution and distrust, and the defendants could not be convicted upon such testimony alone; and, further, should they find that the defendant Jung Kim was a mere employé of the defendant Sam Yick, then Jung Kim could not be considered a conspirator, in which event, should they further find that the government inspectors mentioned performed the acts disclosed by the evidence solely for the purpose of entrapping the defendants and without any understanding with either of the Chinamen, and without any unlawful intent on the part of either of

the inspectors, then that there could be no conviction, whatever the evidence might show that Sam Yick did, since there could be no conspiracy without the participation of at least two persons. The court, according to the record that has been set out, refused to so instruct the jury, itself directed the entry of an exception on behalf of the defendants to the ruling, and, to the contrary, in respect to the acts of the inspectors, distinctly instructed the jury in effect that, if the government officers did instigate or induce the defendants to commit the offense alleged against them, it constituted no bar to the prosecution by the government, to the giving of which latter instruction the court itself, according to the record, also directed the defendants' exception thereto to be entered.

We think that the attention of the court was by the proceedings above referred to, of necessity, called to the correctness of the instruction given, and at the proper time excepted to, and that is here assigned as error. In the recent case of Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604, we distinctly adjudged that it is against public policy to sustain a conviction for crime where the party or parties are induced to commit it by officers of the government who thereafter ensnare and apprehend them in such commission. In addition to the authorities there cited in support of that conclusion, see, also, Taylor v. United States, 193 Fed. 968, 113 C. C. A. 543, decided by this court prior to the decision in Woo Wai v. United States, supra; United States v. Healy (D. C.) 202 Fed. 349; United States v. Jones (C. C.) 80 Fed. 513; United States v. Adams (D. C.) 59 Fed. 674; United States v. Whittier, Fed. Cas. No. 16,688, 28 Fed. Cas. 594.

For the reason above stated, the judgment is reversed, and the case remanded to the court below for a new trial.