PETERSON v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1919.)

No. 3185.

1. CRIMINAL LAW ⊜▷37—DEFENSES—ENTRAPMENT.

Where officers of the law have incited a person to commit the crime charged, and lured him on with the purpose of arresting him in its commission, the law will not authorize a verdict of guilty.

2. CRIMINAL LAW ⊜▷739(1)—QUESTION FOR JURY.

In a criminal prosecution, where the defense was that defendant was incited and induced to commit the offense by officers for the purpose of entrapment, the refusal of instructions submitting that question to the jury as one of fact, and the giving of instructions treating it as one of law, and charging that it presented no defense, was error.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; Edward S. Farrington, Judge.

Criminal prosecution by the United States against Ida Peterson. Judgment of conviction, and defendant brings error. Reversed.

A. P. Black, of San Francisco, Cal., for plaintiff in error.

Annette Abbott Adams, U. S. Atty., John W. Preston, Sp. Asst. Atty. Gen., and James E. Colston, Sp. Asst. U. S. Atty., all of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. [1] It is the settled rule in this circuit that where the officers of the law have incited a person to commit the crime charged, and lured him on to its consummation with the purpose of arresting him in its commission, the law will not authorize a verdict of guilty. Taylor v. United States, 193 Fed. 968, 113 C. C. A. 543; Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604; Sam Yick et al. v. United States, 240 Fed. 60, 153 C. C. A. 96. The distinction between such a case and the well-recognized rule authorizing the use of decoy letters to detect a crime already committed was clearly pointed out by this court in the case of Holsman v. United States, 248 Fed. 193, 199, 200, 160 C. C. A. 271.

[2] In the present case the plaintiff in error was charged by indictment with selling intoxicating liquor, namely, three bottles of beer, to a soldier named George Garis, who was a corporal, while in uniform, on the night of August 11, 1917. The case as made by the evidence showed, among other things, that the defendant owned a three-story house on the corner of Devisadero and Lombard streets, San Francisco, known as the Fairview Hotel, the lower floor of which was used as an ice cream parlor, in which were also sold tobacco, cigars, candy, soft drinks, and like articles. The two upper floors contained 20 rooms, 4 or 5 of which were used by her family, and the remainder rented to roomers and boarders as occasion offered.

There was certainly ample evidence given tending to show that the

⊜▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

255 F.—28

plaintiff in error willfully violated the law in selling to the soldier the intoxicating liquor, and that, complaints having been received by the officers of the law from different sources that she was engaged in such unlawful traffic, Garis and another soldier, as well as a police officer named Hand, all dressed in United States uniform, were sent to her place to investigate, and that during such investigation the defendant did in fact sell to Garis, for money, three bottles of beer; but the defendant testified in her own behalf, among other things, as follows:

"On the evening of August 11, 1917, two boys came in and asked me for a room, rang the bell, and I came out. I brought them upstairs in room 15, and they registered under a fictitious name. Corporal Garis said, 'Say, I want to see you about something.' He called me off to one side. He said, 'Can you slip me a couple of cold bottles of beer?' I says, 'No, sir; I cannot slip you any cold bottles of beer; and, furthermore, if you want any beer, you get out.' He says, 'You need not be afraid of me; I am not one of those fly cops, or a stool pigeon, or anything like that; you need not be afraid of me.' He says, 'I know you sell it; you might as well sell it to me.' I says, 'If you think you are going to get any beer from me, you are badly mistaken; I never sold a bottle of booze here.' He kept on nagging me, and I says, 'I have got to go downstairs and attend to business.' I should judge this was around 6 o'clock, because we generally eat about then, and I got called away from the supper table. I cannot say exactly the minute; I am always busy. After having refused beer to Corporal Garis, I went back to my supper table. It is on the second floor, and they are on the third floor. He came downstairs and called me out. He came out the door, and said he wanted to see me. He says, 'Where is that beer you promised me?' I said, 'What are you talking about? I do not sell any beer. What is the matter with you?' He says, 'Well, I have to have some beer; I never mind the price; I have paid as high as a dollar a quart on the Coast; I do not care what you charge me; I have to have it; I have been hiking all day.' I refused him. I said, 'I have no beer for soldiers; there's no use trying to get it; you might as well go back to your room.' I then went down to the candy place.

"There were two men registered in room 15. I only saw two that were present at that time. I am not acquainted with either Officer Hand, Corporal Garis, or Corporal Conley, and had never seen them before, that I remember. My recollection is that it was Corporal Garis who did the talking. The first request for beer was made when they rented the room. They called me off to one side. I should judge that it was 15 minutes after that that one of them came down to my living room on the second floor. That was Corporal Garis, as I remember. He knocked at the door; he called me off to one side, and he said, 'Where is that beer that you promised me?' I repeated the same thing. I said, 'There is no use wasting any time with you; I have got to go downstairs and attend to the ice cream parlor.' It was full of soldiers because it was pay day. When I went down to the ice cream parlor it must have been between a quarter to 7 and 7 o'clock. It is hard to tell exactly how long I stayed in the ice cream parlor, as I was very busy, and to tell you the truth I cannot tell the time exactly to a minute. Between 7 and 8 o'clock Officer Hand came down and says, 'I would like to have a little change; I would like to have that beer you promised to bring up.' He told me he was drilling six hours a day; that they were exhausted; he had to have the beer, it did not make no difference how much it cost. He just kept on nagging me. He says, 'You look pretty good-natured'—I guess because I am good-natured and fat—'you might as well come across and give us some beer; we have to have it.' I said, 'I cannot sell any beer. What is the matter with you? Do you want to get me in trouble?' He said, 'Oh, that is all right; you can bring us up a couple of bottles.'

"Q. Did you say that in a very kindly tone, or did you say it positively? A. I was all excited. I slammed the door in front of their room the first time. I told them to leave me alone. First Garis came down twice; then Hand came down. They kept on nagging me for about three hours. They told me,

'Everybody sells it around the corner; you might as well give us a couple of bottles.' I went and gave them a couple of bottles. A soldier by the name of Rose came up the stairs, and he said, 'What is this argument?' I said, 'They want beer.' He says, 'Who are they?' I said, 'I don't know; it is no interest of mine who they are; I don't know.' I did not see Rose afterwards. Rose roomed at my place on and off. He is in the guardhouse now.

"Q. What time of the night was that, that you finally gave them the three bottles of beer? A. I think it was about half past 9; maybe it was a little later. I never made the remark, 'Here I come to be arrested.' The only thing, one of them said to me, 'What's the matter? Haven't you any use for soldiers?' I said, 'Why shouldn't I? My own son is in the army; he volunteered, and the other is ready to go. I have been dealing with soldiers for the past 19 years; why shouldn't I have use for soldiers?' By 'dealing with soldiers' I mean I was in the laundry business, and I washed for soldiers in the Post Laundry. We called it that, so as to get the soldier's trade. We are just one block from the Presidio, and our business has been almost exclusively with soldiers for the last 20 years.

"Mr. Black: Q. What induced you to sell that beer to those soldiers? A. They worked my good nature, I guess, and my sympathy; because I see them drilling in front of my door, and they come in by the dozens and get ice cream; my boy is in the army; when he started to drill, he was all stiff and sore; I know what it is. They said they had to have it, and I was feeling bad for them; I didn't mean to do any wrong. Furthermore, I never asked them no price. Room 20 is right above my office on the third floor, and room 14 is right opposite from room 20, and room 15 is just a little bit triangle from that. There are 10 rooms on the third floor and 10 rooms on the second floor. I saw a soldier named Slabin there that night. Garis was talking to me when I saw Slabin. I should judge my door was 15 or 20 feet from Slabin's room when Garis was talking to me."

And there was testimony given by other witnesses tending to support that of the defendant upon the point in issue.

The record shows that the trial court refused to give to the jury, to which refusal an exception was duly reserved, the sixth and seventh instructions requested by the defendant, which are as follows:

"Sixth. The defendant is charged with selling beer to an officer or member of the military force of the United States Army while in uniform. The defendant claims that she was entrapped into selling three bottles of beer through the instigation of the government agents, and that the beer would not have been sold at all, if it had not been for the importunities and false statements made by the officers and detectives who went to her rooming house, admittedly for the purpose of entrapping her into the commission of the offense; and in this connection I charge you that, if you believe from the evidence that the defendant was induced by the importunities of the government agents to violate the law, and that through the instigation of either Police Officer Hand or Corporal Garis representing the government, the defendant, Mrs. Peterson, was induced to sell them three bottles of beer, and that she otherwise would not have violated the law, then you should return a verdict of 'not guilty,' as it is the policy of the United States courts not to uphold a conviction in any case where the offense was committed through the instigation of the government agents.

"Seventh. If you find from the evidence that Police Officer Hand, accompanied by Corporal Garis of the United States Army, went to the rooming house of the defendant and hired a room from the defendant, and thereafter importuned the defendant to sell them some beer, which the defendant refused to do, and that thereafter they induced one Harry Rose, a soldier who was rooming in the house of the defendant, to go to the defendant and again importune her to give to Police Officer Hand and Corporal Garis aforesaid, two or more bottles of beer under the statements that the last two named persons were friends of Rose, which statements were willfully false and made for the purpose of deceiving and inveigling the defendant into a viola-

tion of the law, and that, yielding to the importunities, the defendant did procure from her private stores of liquor, the three bottles testified to by Officer Hand and Corporal Garis, and you further believe that the defendant without such solicitation and importunity would not have violated the law, then it is your duty to acquit the defendant, for the reason heretofore stated, that the federal courts do not uphold convictions for offenses committed through the instigation of the government agents."

Instead the court in its charge instructed the jury as follows:

"The defendant on the witness stand has admitted that she gave the beer to Garis, and that she received in exchange money. The excuse and defense offered by her is that she was solicited to sell the beer to the man Garis. There is raised only one real question of law in the case. It is needless for me to say that the government is not engaged in the business of manufacturing criminals; for an officer to go to a law-abiding citizen and by solicitation and persuasion induce him to commit a crime is something abhorrent to all our sense of decent administration of law; and where the crime is committed under such circumstances, the courts have always been inclined to, say that a crime thus induced, if so shown, is not sufficient to support a conviction. That is decided in the Chinese smuggling case of United States v. Woo Wai. That case, as I stated yesterday, was precisely of that character. A Chinese, not suspected, so far as the record shows, of being. engaged in the business of smuggling Chinamen into the United States, was approached by an officer who professed to be in that business, and induced Woo Wai to enter into a scheme to smuggle Chinese from Mexico. Of course, the conduct of the officer was reprehensible, and the Circuit Court of Appeals characterized it just as it should be, and characterized it very severely. But there is a class of offenses, like the unlawful selling of intoxicating liquor, frequently committed by people who are cunning, and it is difficult to secure the evidence necessary to a conviction by any other means, except by the use of decoys; and you are instructed that if it appears in this case that the officers had information which led them to believe, and they were justified in believing that the premises occupied by the defendant was a place where an unlawful business was being conducted, that is, that the defendant was engaged in selling intoxicating liquor to members of the military service, while in uniform, it was very proper for them to initiate an investigation, and if the two soldiers, Garis and Conley, and Police Officer Hand, clad in military uniform, went there and solicited beer and offered to buy it, and urged her to sell it to them, the fact that they urged her to sell the beer to them is no excuse."

It is apparent from what has been said that the sole defense of the defendant was that she was instigated to commit the crime by the officers, which was purely a question of fact for the determination of the jury. If she was, then the law is, as above pointed out, that a verdict of guilty could not be sustained, from which it follows that the instructions requested and refused should have been given. The difficulty with the learned judge of the court below was that he treated the question as to whether or not the defendant was instigated to commit the crime by the officers as a question of law and not of fact, as is evident from the portion of his charge which has been quoted, in which, as will have been seen, he expressly said to the jury:

"There is raised only one real question of law in the case," and in its conclusion that "if the two soldiers, Garis and Conley, and the Police Officer Hand, clad in military uniform, went there and solicited beer, and offered to buy it, and urged her to sell it to them, the fact that they urged her to sell the beer to them is no excuse."

It is obvious that the case did not present any question of law for the jury to determine, and only one controverted. question of fact—

that is to say, whether or not the defendant was instigated by the officers to sell the beer.

It results that the judgment must be and is reversed, and the case remanded for a new trial.