SCOTT, District Judge, concurs in the result.

---

## ST. CLAIR v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1927.)

No. 7401.

Criminal law ⟨⇒⟩37—Officers may lawfully entrap defendant by pretended purchases, where they have reasonable cause to believe he is violating the law (National Prohibition Law [Comp. St. § 10013⅛¼ et seq.]).

Where officers or agents have reasonable cause to believe defendant is violating the National Prohibition Law (Comp. St. § 10138¼ et seq.), they may lawfully entrap him by pretended purchases.

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Criminal prosecution by the United States against Frank St. Clair. Judgment of conviction, and defendant brings error. Affirmed.

H. J. Requartte, of Lincoln, Neb. (T. S. Allen and E. G. Maggi, both of Lincoln, Neb., on the brief), for plaintiff in error.

George A. Keyser, Asst. U. S. Atty., of Omaha, Neb. (James C. Kinsler, U. S. Atty., of Omaha, Neb., and L. C. Dibble, Asst. U. S. Atty., of Lincoln, Neb., on the brief), for the United States.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The plaintiff in error, hereinafter referred to as the defendant, was indicted in two counts with one Fred Gladfelter for conspiracy to violate the National Prohibition Act (Comp. St. § 10138¼ et seq.) to possess, transport, and sell intoxicating liquors, and for selling intoxicating liquors. The first count charged the conspiracy, and the second count selling intoxicating liquors.

Upon arraignment, he entered a plea of not guilty. He was tried alone, there having been a severance granted to Gladfelter. His codefendant testified as a witness for the government, and, upon a verdict of guilty on both counts, the defendant was sentenced on both counts. To reverse the judgment, this writ of error is prosecuted.

There are sixteen assignments of error, but the only ground relied upon in the brief and oral argument of his counsel is that he was entrapped by the officers and by them induced to commit the crimes charged. This was properly raised by a motion at the close of all the evidence for a directed verdict of not guilty on both counts, and by instructions to the jury requested and by the court denied, to which proper exceptions were reserved.

The court in its charge to the jury stated that "in its opinion there was not sufficient evidence here of any entrapment of the defendant," which was also excepted to.

The defendant in his testimony denied: That he transported, sold, or possessed any intoxicating liquors, or had any agreement, express or implied, with his codefendant Gladfelter to do so. That he never had any agreement with Brehm or Gladfelter or any one else to transport or sell any liquor. That he went to Brehm's house in his own car with Gladfelter to buy a truck from him, "as I had wanted to buy one and a man by the name of Abels referred me to Brehm. When we drove there, I didn't know where Brehm lived, but learned by inquiries. When I reached his house two fellows were standing in front of the house, who told me that it was

Brehm's house, to walk in, as Brehm would be back in a minute. I don't know who the men were, but neither of them testified as a witness at the trial." He did not drive his car to the house, but left it a short distance from the house. He also testified that he negotiated with Brehm for the truck, which he wanted to buy for his brother-in-law, who lived 14 miles from Omaha. Brehm wanted $225 for his truck.

Abels was not called as a witness.

He denied on cross-examination that he had ever served a sentence in the Nebraska Penitentiary. After the government on rebuttal had introduced evidence of his conviction and sentence of imprisonment in that penitentiary, he was recalled by his counsel, and stated that, when he denied his imprisonment, he was under the impression that the question related to the town of Nebraska, in the state of Nebraska. (There is no state prison in that town.) He also admitted that he had served 2½ years in the Iowa State Penitentiary.

Brehm, on rebuttal, testified that he had no conversation with the defendant about the sale of a truck, as he did not own one at that time.

As it is not claimed that the verdict was not amply sustained by the evidence, entrapment to commit the offense is the only question before us.

Gladfelter testified: That he has known the defendant four years. That he first met him while they were inmates of the Nebraska State Penitentiary. In March, 1924, he met the defendant in a soft drink parlor in Lincoln, Neb., and "he took me to supper. After supper he wanted me to haul some stuff, he said, to go out in the country. I told him I would. He had a Dodge touring car with the curtains up. We went out by University place, and on the way out he said he had to deliver some stuff to Brehm, but he didn't call him by name, simply mentioned him as 'this Russian.' I didn't know Brehm's name, then. He had the stuff ditched there. We found some alcohol there in the weeds on the east side of the road; before that we found the 'hootch' in a straw pile on the same road, and then we went out and got the two gallons (referring to the alcohol). They found three gallons of hootch there. St. Clair said he was going to meet that Russian there, so we turned out the lights. Some men drove up, and we picked them up; it was pretty dark. St. Clair loaded the stuff into the car of the other men; I don't know whose car it was, it was a Ford coupé. St. Clair said he had three gallons stolen. The alcohol and whisky was in

the front part of the car with us; I tasted the whisky as he gave me a drink, and know it was corn whisky. The whisky was in gallon glass jugs in a gunny sack. The alcohol was in square gallon cans. I heard St. Clair and Brehm talking, but didn't hear what they said, as I was 50 or 100 feet further back. St. Clair carried three gallons of whisky to Brehm's car. He had more than one sack when he make the trip; one had three round jugs in it and the other had two cans. After St. Clair returned, he said he had to get a couple of more gallons. We went back north and got two gallons at the same place, and then started back to town. I asked him if he knew Brehm has just been pinched here, and he said, 'Yes.' He left me about a block and a half or two blocks from the house, and took these two gallons with him. I am one of the defendants in the case on trial, and entered a plea of guilty to the first count, charging conspiracy. No promise was made to me, but I thought I maybe could get off easier by pleading guilty and telling the truth."

Brehm testified: He knew the defendant and pointed him out in the courtroom. "I saw him in March, 1924, at a soft drink parlor and asked him if I could get any 'moon' off of him, or any liquor. He said I could have it, if I was a nice straight fellow. So we made a bargain for five gallons of whisky off of him, and two gallons of alcohol. After we made that agreement he told me what time I should be up there at the place so as to get the stuff. He said he would be there shortly before 8 o'clock, or at 8 o'clock, so I went to the sheriff's office and got John Smith, a deputy, and we went out there, both of us, to get the stuff from him. I was employed by the sheriff's office at the time, and he wanted to know if I knew the defendant, and I told him I didn't know him, but could easily get acquainted with him. He asked me to make arrangements to get money to buy the liquor, and I did, but 'I did not use it. The price he made me was $7 a gallon for the liquor and $12 a gallon for the alcohol. I told him I would take five gallons of liquor and two gallons of alcohol. Smith and I went to the place where St. Clair had arranged to meet me, and he got there about 8 o'clock. I asked him where he had the liquor, and he handed me the stuff, and I put it in my car. He said he had bad luck that night, some one had stolen some of it, and he could only get me three gallons of whisky and two gallons of alcohol, but said he would get me two more bottles, but would have to go back to the storage pile to get them for me. I told them to get

them and bring them to my place, where I lived, and I went home, drove the car in my garage, and left the stuff there. A little later St. Clair came through the alley and handed me the stuff, and put it in the garage. After I got it in the garage, I told him to come on and I would give him the money, and he handed me a package in a gunny sack. The officers were in hiding in a neighboring barn about three feet away, and I called them, and they arrested him in my house. Gladfelter was with him that night."

Arthur H. Smith, a deputy sheriff of Lincoln, Neb., testified: That he knew Brehm. "That evening I went out with him in his Ford touring car directly north of University place, and three miles from the center of Lincoln. We saw a car standing there and Brehm said: 'That's his car.' The man there was St. Clair. He told Brehm to drive up in front of the car, which he did. I didn't get out. Brehm got out and went with the other man to the side of the road, and the other man came back with two burlap sacks. Brehm and St. Clair came over with him, and then they put them in Brehm's Ford; Gladfelter was in defendant's car. I knew him and recognized him; there was something said about there being only three gallons of whisky and two gallons of alcohol, and defendant said something about having had three gallons of whisky stolen from him. We then drove back to Brehm's house and waited for St. Clair who came up 20 or 25 minutes later, and handed Brehm a package, apparently two cans with some paper and apparently some burlap around them, and he said, 'John, you had better hide this with the rest.' We then walked into the house and in a few minutes Mr. Carroll, the sheriff, Mr. Voorhess and Mr. Hensley came in and arrested the defendant. I felt the sacks and felt there were two little tops in one sack and in the other felt the glass jugs. I also felt two cans in Brehm's car that night, which had been put in when they met on the road."

The chemist of the state of Nebraska testified that he has made a chemical analysis of the liquors, shown by other witnesses to be those he was charged with having transported and sold, and that the alcohol was 95 per cent. pure alcohol, and the whisky, which was moonshine, contained pure grain or ethyl alcohol 25 per cent. by volume.

The other officers testified to practically the same facts as Smith did. The liquor which the chemist had examined was identified as the whisky and alcohol which was delivered by the defendant to Brehm.

William Splanters testified on behalf of the defendant that he had a conversation with the witness Brehm soon after defendant's arrest, when he told him that "the officers had promised they would let him go, if he would testify against St. Clair; that he had got the defendant in a trap so that he could get out himself." Brehm denied positively that he ever had a talk with Splanters, and did not tell him what Splanters testified he had told him. Upon that evidence it was clearly the duty of the court to deny the motion for a directed verdict, as to the contention of counsel for defendant that the defendant was induced to commit the offenses by entrapment.

What constitutes entrapment has been so frequently determined by this court and all national courts, including the Supreme Court, that it is no longer an open question. It is only when the proof in a particular case established an entrapment by officers, different from the facts in this case, that this defense has been sustained.

In Rossi v. United States, 293 F. 896, this court quoted and followed the rule enunciated by the Circuit Court of Appeals for the Sixth Circuit in Billingsley v. United States, 274 F. 86, 89.

"The evidence offered on the part of the United States tends to prove that the public officials of Michigan were acting in good faith; that they did suspect, and had reasonable ground to suspect, that these defendants were engaged in the unlawful transportation of liquor into the state of Michigan; and that these officials made no mistake in arriving at that conclusion."

Without citing the numerous authorities on this subject, we refer only to the latest decision of this court (C. M. Spring Drug Co. v. United States, 12 F.[2d] 852, 856), where it was held:

"It is well settled by the decisions of the Supreme Court of the United States, we think now universally followed in the several circuits, that, where the government, through its agents, has reasonable cause to believe that the law is being violated by the defendant, they may legally entrap the defendant by decoy letters or by pretended purchasers"— citing a large number of authorities.

In Ritter v. United States, 293 F. 187 (C. C. A. 9), Judge Rudkin, speaking for the court, said:

"In Peterson v. United States, 255 F. 433," we held: "'It is the settled rule in this circuit that where the officers of the law have incited a person to commit the crime charged, and lured him on to its consummation with the purpose of arresting him, * * * the law will not authorize a verdict of guilty'. From that rule we have no desire to depart. * * * But if the intent and purpose to violate the law are present the mere fact that public officers furnish the opportunity is no defense."

It then quotes from the Woo Wai Case (C. C. A.) 223 F. 412, the following excerpt, which it followed:

"The idea of the law is, however, that a man who is engaged in unlawful business may have an opportunity, and the government officers may afford him an opportunity, to commit a crime. If a government officer goes into a place, asks for a drink of whisky, and it is given to him at his solicitation, convictions based on such evidence are frequently sustained."

The court committed no error, and the judgment is affirmed.