**UNITED STATES of America,**
**Appellant,**

v.

**Dwight DION, Sr., Appellee.**

**UNITED STATES of America, Appellee,**

v.

**Asa PRIMEAUX, Sr., Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Dwight DION, Sr., Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Lyle DION, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Terry Fool BULL, Appellant.**

Nos. 83–2353, 83–2521, 85–2538, 83–2543 and 83–2544.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1984.

Decided May 20, 1985.

Michael Dow, William D. Kenyon and Richard Johnson, Sioux Falls, S.D., for Dion and appellants.

James Kilbourne, Dept. of Justice, Washington, D.C., for United States.

Before HEANEY, JOHN R. GIBSON and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Dwight Dion, Sr., Lyle Dion, Jr., Asa Primeaux, Sr., and Terry Fool Bull appeal their convictions of "taking" or "selling" eagles and other protected migratory birds or bird parts in violation of the Bald and Golden Eagle Act (BGEA), 16 U.S.C. §§ 668–668d (1982), the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–711 (1982), and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1543 (1982). As the appeals stood when we first heard oral arguments, the four appellants raised ten issues, one of which was whether, under *United States v. White*, 508 F.2d 453 (8th Cir.1974), the charges against the Dions should be dismissed. In *White*, we held that an enrolled member of the Red Lake Band of Chippewa Indians who shot at an eagle within the boundaries of the Red Lake Reservation could not be convicted of "taking" an eagle under section 668 of the BGEA because Congress had not expressly provided that this section abrogated Indian treaty rights to hunt on their reservations.

We certified the treaty issues to the Court *en banc* which adhered to *White*, applied it to members of the Yankton Sioux Tribe hunting within the confines of their reservation, and extended *White* to criminal prosecutions under the ESA. The Court held, however, that *White* did not extend to "selling" protected birds or their parts or "taking" protected birds or their parts for commercial purposes.[1] Accordingly, the Court affirmed the district court's dismissal of one "taking" count against Dwight Dion, Sr., vacated and remanded for retrial, at the government's option, two "taking" counts against Dion, Sr., and one "taking" count against Lyle Dion and affirmed the remaining eight "selling" counts against Dion, Sr., and one "selling" count against Lyle Dion. The *en banc* Court noted that Terry Fool Bull and Asa Primeaux, Sr., did not raise the treaty issues on appeal, but that, in any event, *White* was not applicable to their cases

---

1. Because all the counts under the MBTA were for "selling" protected migratory birds, we did not reach the question whether *White* might bar a prosecution under that Act of an Indian for "taking" a protected bird within the confines of the reservation.

because their allegedly criminal acts were not committed on land reserved to an Indian tribe of which they were members. The *en banc* Court then remanded the appeals of the Dions, Fool Bull and Primeaux, Sr., to this panel to determine the remaining nontreaty issues. 752 F.2d 1261 (8th Cir. 1985) Before turning to an examination of the issues, we set forth the significant facts which relate to all four appellants.

## I. FACTS.

These cases involve criminal prosecutions which arose from a United States Fish and Wildlife Service (FWS) undercover operation ("Operation Eagle") conducted in South Dakota from February 25, 1981, to June 15, 1983, to investigate the killing and selling of eagles and other protected birds. The government claims that it first learned of possible killing of protected birds in South Dakota in 1978 when FWS agent John L. Cooper received reports that "an excess number of birds were being picked up" around the Yankton Sioux Reservation near Lake Andes, South Dakota.[2] Agent Cooper began an investigation to determine if individuals were violating federal wildlife laws and, in 1980, "actively" assigned an agent to do investigation in the area. In 1980, a Navaho medicine man in New Mexico told FWS agents that Indian crafts made with protected bird parts were arriving from South Dakota for sale in New Mexico. The medicine man gave FWS agent Nando Mauldin the names of the five alleged suppliers in the Lake Andes area of South Dakota. Shortly thereafter, "Operation Eagle" began.

Mauldin sent letters to the five alleged suppliers from the Lake Andes area advising them that he "was a trader in the Southwest part of the United States * * * interested in obtaining Indian-made items for resale throughout the Southwest." In the fall of 1980, he received a response from Joe Abdo of Lake Andes inviting him to South Dakota and indicating that Abdo and several other individuals would sell eagle feathers to Mauldin. Mauldin traveled to South Dakota to meet Abdo, and on February 25, 1981, was introduced to several Indians who traded in Indian crafts, including Asa Primeaux, Sr., and Dwight Dion, Sr. Mauldin claimed that his fictitious company, Night Hawk Trading Company, would pay "top dollar" for Indian handcrafts made from eagle or other protected bird feathers, or for parts of protected birds. On that day, Mauldin passed out approximately $2,000 in cash for several fans and other Indian crafts made from protected bird feathers and handed out several business cards.

Over the next year and a half, Mauldin visited the Yankton Reservation area several times and apparently paid several thousand dollars to a number of Indians, including appellants Asa Primeaux, Sr., and Dwight Dion, Sr., for Indian fans made from protected bird feathers, and for various protected bird feathers and parts. Mauldin passed out more business cards, and his willingness to pay handsomely for crafts made from protected bird parts or for the parts alone became well-known in the area. By August of 1982, the government had compiled substantial evidence of trafficking in protected bird parts against several Indians, including Dion, Sr., and Primeaux, Sr. Rather than prosecuting these individuals, who proved to be the main actors in the protected bird and feather trade, the government expanded "Operation Eagle" in August, 1982, by assigning a second agent, Robert Standish, to the undercover operation.

Standish made several visits to the Yankton Reservation, and represented himself as an Indian art dealer and owner of a

---

**2.** Harry T. Stone, Refuge Manager for the FWS at Lake Andes, South Dakota, testified at Dwight Dion, Sr.'s, trial, however, that in 1981, there were not a lot of deaths of bald or golden eagles on any of the wildlife refuges in the Lake Andes area. Mr. Stone also testified that the Carl Mundt National Wildlife Refuge was established for the specific purpose of protecting bald eagles, and that it is one of the largest wintering areas for bald eagles in the lower forty-eight states, that the refuge is not open for public access, and that he had never seen any of the defendants within the Carl Mundt Refuge or in the other refuges.

gallery. During the late summer and fall of 1982, he and Mauldin passed out more business cards on the Reservation and paid out more money to several Indians including Primeaux, Sr., for Indian crafts made from protected bird feathers and parts, and for the feathers and parts themselves. The agents also offered several hundred dollars for each whole protected bird.

Word spread throughout the Yankton Reservation that Mauldin and Standish were paying thousands of dollars in cash for protected bird artifacts, feathers, parts and whole birds. This reservation is located in a remote and desolate area of South Dakota, and is one of the most impoverished areas in the nation. The 1980 census reports that the 1979 per capita income on the Yankton Sioux Reservation was less than $2,500, and more than half of all families on the Reservation were below the poverty level. Nearly a third of all persons on the Reservation, including two of the appellants in this case, Terry Fool Bull and Asa Primeaux, Sr., report Lakota as their primary language.

In December of 1982, nearly two years after Operation Eagle began, the agents purchased their first whole protected birds when they gave Dion, Sr., $2,300 for the carcasses of four eagles. At this time, the agents also made their first and only transaction with Lyle Dion, Jr., when they purchased an eagle tail and then the rest of the eagle from him.

The agents still made no arrests, however, and over the next several months paid several thousand more dollars to Dwight Dion, Sr., for an additional four bird carcasses, to Asa Primeaux, Sr., for three bird carcasses, and in their first and only transaction, to Terry Fool Bull, Asa's son-in-law, for an eagle carcass.

The Dions, Primeaux, Sr., and Fool Bull were subsequently tried, convicted and sentenced to prison. We turn now to the contentions of each appellant.

**A. Dwight Dion, Sr.**

Dwight Dion, Sr., was convicted of ten counts of violating the BGEA, the ESA and the MBTA. The specific sections violated are set forth in detail in the *en banc* decision of this Court which vacated and remanded two of Dion, Sr.,'s ten counts. Dion, Sr., now raises four arguments why all ten counts, or at least certain of the counts, should be dismissed outright.

*1. Religious Freedom.*

Dion, Sr., first contends that his conviction for "taking" and "selling" eagles and other migratory birds under the BGEA, the ESA and the MBTA violates his first amendment right of religious freedom. He also notes that 42 U.S.C. § 1996 (1982) provides that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian * * * including but not limited to * * * possession of sacred objects[.]" Additionally, Public Law 95–341, which enacted 42 U.S.C. § 1996, provides in part that "laws designed for such worthwhile purposes as conservation and preservation of natural species * * * were never intended to relate to Indian religious practices" or to "prohibit the use and possession of sacred objects necessary to the exercise of religious rites and ceremonies[.]"

The district court found that it "is clear from the record herein that possession and transportation of eagle feathers and parts of eagles are integral parts of Indian religious practices." However, the court noted that Indians can acquire eagles and eagle parts from a government depository in Pocatello, Idaho, and thus, there is no need for Indians to kill eagles for religious purposes. Dion, Sr., contends that making Indian artwork from protected feathers is a part of his religious culture and that unless he can make and sell these items, he will be denied an opportunity to practice his religion fully.

The government contends that Dion, Sr., was taking and selling birds purely for commercial gain. It also notes that Dion, Sr., has never stated that the Native Amer-

ican Church of North America or his local chapter sanctions the killing of eagles, and that at least one court has found that the killing and selling of eagles and eagle parts is against tribal custom and religion. *United States v. Top Sky,* 547 F.2d 486, 487 (9th Cir.1976). We also note that several Indian leaders testified at a consolidated hearing on September 2 and 6, 1983, that the killing of eagles, at least for commercial purposes, is contrary to Native American beliefs, and was generally an unknown practice on the reservations in South Dakota, at least before Operation Eagle began. Additionally, Douglas Long, current president of the Native American Church of North America, testified that Article II of the church's laws provides that the church "looks with disfavor on the practice of the pawn and sale of religious prayer instruments" which includes feather fans.

■ We agree with the government and affirm the district court's ruling. The record reveals that Dion, Sr., was killing eagles and other protected birds for commercial gain and not for religious purposes, and thus his religious freedom argument is without merit. *See Top Sky,* 547 F.2d at 485.

### 2. *Selective Prosecution.*

After his trial, Dwight Dion, Sr., moved to overturn his convictions and dismiss the indictments on the ground he was selectively prosecuted. He also claims that the government had been served with materials in two other prosecutions under "Operation Eagle" which supported the selective prosecution claim and should have been turned over to him under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These materials contain the following: (1) numerous advertisements in national magazines offering for sale Indian art items allegedly containing protected bird feathers or parts; (2) a picture of a famous entertainer wearing an alleged bald eagle feather headdress while performing at the White House before a group which included then-Secretary of Interior James

Watt; and (3) pictures of an Indian shield attached to which are several protected bird feathers. Dion claims the shield was purchased at a Mt. Rushmore store run by white proprietors and that the proprietors were not prosecuted. Dion, Sr., claims that the government was not prosecuting whites who dealt in protected bird feathers and parts but had prosecuted only Indians because of their race. The trial court denied the motion, and Dion, Sr., appeals this ruling.

■ The government contends that under Fed.R.Crim.P. 12(b)(1) and 12(f), Dion, Sr.'s, selective prosecution motion was untimely because it was not made prior to trial. We agree. A selective prosecution claim "brings into question the institution of the prosecution; Rule 12(b) requires such issues to be raised prior to trial." *United States v. Jarrett,* 705 F.2d 198, 205 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984).

### 3. *Unconstitutional Delegation of Legislative Authority.*

Dion, Sr., next contends that the district court erred in refusing to dismiss his six counts of selling migratory birds in violation of the MBTA because section 3 of the MBTA, 16 U.S.C. § 704 (1982), which authorizes the Secretary of Interior to promulgate regulations establishing who may take or possess migratory birds, constitutes an unlawful delegation of legislative authority to the executive branch. Dion, Sr., claims that section 3 of the MBTA, 16 U.S.C. § 704, lacks definite standards, as required by *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), to guide the Secretary in deciding who should be exempted from prosecution under 16 U.S.C. § 703.

In response, the government notes that several courts have upheld the validity of the delegated rulemaking authority in 16 U.S.C. § 704. *See, e.g., Bailey v. Holland,* 126 F.2d 317, 321 (4th Cir.1942); *Cerritos Gun Club v. Hall,* 96 F.2d 620, 629 (9th Cir.1938); *United States v. Griffin,* 12 F.Supp. 135, 137–38 (S.D.Ga.1935). It also

points out that section 704 does contain definite criteria to guide the Secretary's rulemaking authority because it provides that the Secretary's regulations shall be "compatible with the terms of the conventions" enumerated in 16 U.S.C. § 703. It notes that these conventions identify clear standards for determining when and for what purposes migratory birds may be taken or possessed. *See, e.g.,* 1916 Convention with Great Britain, 39 Stat. 1702 (Aug. 16, 1916). Dion, Sr., however, agrees that section 704 sets forth adequate standards under which the Secretary can determine *when* and for *what purposes* migratory birds can be taken or possessed, but argues there are inadequate standards on *who* should be allowed to take or possess these birds.

We find, however, that the standards set forth in section 704 on when and for what purposes migratory birds can be taken also give the Secretary sufficient guidance on who should be allowed to take migratory birds. Section 704 and the conventions enumerated in section 703 essentially provide that, in limited situations, migratory birds can be taken for scientific or educational purposes. Consistent with this, the Secretary's regulations on who can take or possess migratory birds permit the taking of these birds or their parts by persons or institutions who need them for certain specified scientific or educational purposes. 50 C.F.R. § 21.12 (1984).[3] Finally, we agree with the government that section 704 does not unconstitutionally delegate legislative authority because the Secretary has not promulgated a regulation permitting Indians to sell migratory birds or their parts.

### 4. *Equal Protection.*

Dion, Sr.'s, final argument is quite similar to the unlawful delegation argument discussed above. He argues that his six convictions for selling migratory birds or their parts in violation of the MBTA must be reversed because the regulations promulgated by the Secretary of Interior pursuant to 16 U.S.C. § 704, which do not include an exemption permitting Indians to sell migratory birds or their parts, deny him equal protection of the law. We reject this argument because the regulations do not permit anyone, Indian or non-Indian, to sell migratory birds or their parts for commercial purposes unrelated to education or science.[4] Therefore, the MBTA applies neutrally to all persons.

We also reject Dion, Sr.'s, claim that the regulations, even if neutral, deny Indians equal protection because they fail to recognize that Indians have a unique need to "take" and "sell" eagles for commercial purposes. The record reveals that Dion, Sr., was one of extremely few Indians in the area who were taking or selling eagles and that the sale of eagles is contrary to Native American beliefs and practices. Dion, Sr.'s, claim is contrary to fact.

### B. Lyle Dion.

Lyle Dion was convicted of violating 16 U.S.C. §§ 1538(a)(1)(B) and 1540(b)(1) (1982) of the ESA by taking a bald eagle (Count 1), and violating 16 U.S.C. §§ 703 and 707 (1982) of the MBTA by offering for sale or selling a bald eagle (Count 2). Count 1 was vacated and remanded by the Court *en banc* on Dion's treaty defense and his re-

---

**3.** The regulations also grant limited exceptions for captive-reared migratory waterfowl, 50 C.F.R. §§ 21.13 and 21.14 (1984), for falconry under stringent federal falconry standards, 50 C.F.R. §§ 21.28 and 21.29 (1984), and for limited "special purposes * * * upon a showing of benefit to the migratory bird resource, important research reasons, humane, or other compelling justification." 50 C.F.R. § 21.27 (1984). At trial, the applications examiner for the FWS Division of Law Enforcement testified that, in some very limited situations, permits to kill golden eagles may be issued where they have become predators of domestic animals.

**4.** Dion, Sr., also apparently argues that these regulations deny him due process because they fail to recognize the need American Indians have for bird feathers and parts as a component of their heritage and religion. We reject this claim because the Secretary has made provision for Indians to receive eagle feathers for noncommercial use from a government depository in Pocatello, Idaho.

maining defenses were remanded for consideration by the panel. He raises two issues: (1) whether the court erred by refusing to dismiss the indictment for selective prosecution; and (2) whether he was entrapped as a matter of law by government agents into taking and selling the bald eagle.

Because Dion's selective prosecution claim was raised for the first time after the trial was completed, we reject this claim because it was not timely, as we stated above.

Dion's entrapment claim raises a more difficult question, an understanding of which requires a thorough review of the elements and rationales of the entrapment defense.

1. *The development of the entrapment defense as a bar to prosecution of "innocent" persons tempted into a violation of the law.*

The Supreme Court first suggested the possibility of an entrapment defense in the *Decoy Letter Cases. Price v. United States*, 165 U.S. 311, 17 S.Ct. 366, 41 L.Ed. 727 (1897); *Rosen v. United States*, 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896); *Goode v. United States*, 159 U.S. 663, 16 S.Ct. 136, 40 L.Ed. 297 (1895); *Grimm v. United States*, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550 (1895). In those cases, several defendants challenged their convictions of using the mails to distribute obscene materials across state lines on the ground the obscene material had been solicited by federal undercover agents. Although the Court affirmed the convictions without specifically discussing an entrapment defense, it wrote that the convictions could stand even though the contraband was solicited by a government agent because the undercover agent "suspect[ed] that the defendant was engaged in a business offensive to good morals, sought information directly from him [and it] does not appear that it was the purpose of the post office inspector to induce or solicit the commission of a crime, but it was to ascertain whether the defendant was engaged in an unlawful

business." *Grimm v. United States*, 156 U.S. at 610, 15 S.Ct. at 472.

Twenty years later, the Ninth Circuit became the first federal court to overturn a conviction on grounds of entrapment. *Woo Wai v. United States*, 223 Fed. 412 (9th Cir.1915). That Court reviewed several state cases which established the principle "that a case is not within the spirit of the Criminal Code where an officer 'originates the * * * intent, and apparently joins the defendant in the criminal act first suggested by the officer, merely to entrap the defendant.'" *Id.*, at 415 (citation omitted). The Court quoted several cases, including *Saunders v. People*, 38 Mich. 218 (1878), in which Justice Marston wrote:

Some courts have gone a great way in giving encouragement to detectives, in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing.

*Woo Wai*, 223 Fed. at 416.

Applying these principles, the *Woo Wai* Court overturned the defendant's convictions of conspiracy to bring Chinese persons into the United States because, "[t]here is no evidence that, prior to the time when the detectives first approached Woo Wai, any of the defendants had ever been engaged in the unlawful importation of Chinese, or had ever committed or thought of committing any offense against the immigration laws." 223 Fed. at 414.

In *Butts v. United States*, 273 Fed. 35 (8th Cir.1921), this Court relied on these principles underlying the entrapment defense in reversing Butts's conviction of selling morphine. Judge Sanborn wrote that:

There was ample, if not conclusive, evidence * * * that * * * [t]he defendant had never committed any such offense as the officers of the government arrested and prosecuted him for prior to the time

when they induced him to do the acts disclosed by this testimony. There is no evidence that he had ever contemplated, much less intended to sell any morphine. He had never done so.

273 Fed. at 38.

Judge Sanborn also indicated that:

The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. * * * It is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded and lured him to attempt to commit it.

*Id.* (passage cited with approval in *Sorrells v. United States,* 287 U.S. 435, 444, 53 S.Ct. 210, 213, 77 L.Ed. 413 (1932) ).

In *Casey v. United States,* 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632 (1928), *overruled on other grounds, Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Court refused to consider Casey's claim that government agents improperly induced him to sell narcotics to prison inmates because he failed to raise that claim at trial. *Id.* at 418–19, 48 S.Ct. at 374. However, the Court implicitly approved the investigative technique because "there was probable cause to believe Casey was a habitual" drug user who had supplied drugs to inmates on previous occasions and because he "was in no way induced to commit the crime beyond the simple request of Cicero to which he seems to have acceded without hesitation and as a matter of course." *Id.* at 419, 48 S.Ct. at 374. Justice Brandeis, joined by Justice Butler, dissented on the ground the prosecution "must fail because officers of the government instigated the commission of the alleged crime." *Id.* at 421, 48 S.Ct. at 375. He distinguished government investigations of ongoing criminal schemes from those in which the government instigates the commission of the crime:

I am aware that courts—mistaking relative social values, and forgetting that a desirable end cannot justify foul means—have, in their zeal to punish, sanctioned the use of evidence obtained through criminal violation of property and personal rights or by other practices of detectives even more revolting. But the objection here is of a different nature. It does not rest merely upon the character of the evidence or upon the fact that the evidence was illegally obtained. The obstacle to the prosecution lies in the fact that the alleged crime was instigated by officers of the government; that the act for which the government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The government may set decoys to entrap criminals. But it may not provoke or create a crime, and then punish the criminal, its creature. If Casey is guilty of the crime of purchasing 3.4 grains of morphine, on December 31st, as charged, it is because he yielded to the temptation presented by the officers.

Two months later, Justice Brandeis reiterated his view in the following celebrated passage from his dissent in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

Decency, security, and liberty alike demand that government officials shall be subjected to the rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would

bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.[5]

Justice Brandeis's view that the entrapment defense should focus on the conduct of the enforcement officials, although adopted in later years by several justices of the Supreme Court and several state supreme courts, however, has never commanded a majority of the Supreme Court. Nonetheless, his view that entrapment is concerned with the "origin of intent" to commit the crime is reflected in the modern view that entrapment focuses on the "predisposition" of the defendant to commit the crime.

Illustrative is *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), where Chief Justice Hughes, writing for the Court, focused the on the defendant's state of mind, noting that he was "a person otherwise innocent whom the Government is seeking to punish from an alleged offense which is the product of the creative activity of its own officials." *Id.* at 451, 53 S.Ct. at 216. The court held that:

> We are unable to conclude that it was the intention of Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.

*Id.* at 448, 53 S.Ct. at 215.[6]

In *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the Court reaffirmed that the law of entrapment is designed to prevent "tempting innocent persons into violations." *Id.* at 372, 78 S.Ct. at 821. Applying the predisposition test outlined in *Sorrells,* the Court

found that Sherman was entrapped as a matter of law because the evidence revealed that he was an innocent, although perhaps ductile, party who was beguiled into committing a crime he otherwise would not have attempted.[7]

In *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), the defendant contended that the trial court's entrapment instruction, to which he failed to object, constituted plain error. The Court held that "we need not * * * concern ourselves with any of these questions here, for under any approach, petitioner's belated claim of entrapment is insubstantial[.]" *Id.* at 434, 83 S.Ct. at 1385. The evidence was clear that Lopez had made an unsolicited offer of $420 to an I.R.S. agent to drop his investigation of Lopez's failure to pay a cabaret tax. The I.R.S. agent had never even suggested that he would drop his investigation in exchange for money or favors. Accordingly, Lopez had no claim of entrapment because:

> [t]he conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. Such conduct, of course, is far different from the permissible stratagems involved in the detection and prevention of crime.

*Id.* (emphasis in original).

In its two most recent rulings on the defense of entrapment, the Court has reemphasized that this defense focuses on the defendant's "predisposition" to commit the crime, and requires courts to draw a line between traps for the "unwary criminal" and the "unwary innocent." In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a five-to-four majority reinstated the defendant's convic-

---

**5.** Justice Holmes also dissented on the ground that "the Government should not itself foster and pay for other crimes." 277 U.S. at 470, 48 S.Ct. at 575.

**6.** Justice Roberts, concurring, joined by Justices Brandeis and Stone, wrote that "[t]he applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents." 287 U.S. at 459, 53 S.Ct. at 219.

**7.** Justice Frankfurter, concurring, joined by Justices Douglas, Harlan, and Brennan, wrote that a prosecution should be barred, without regard to the defendant's culpability, if police conduct falls below standards for proper use of governmental power.

tion of unlawfully manufacturing methamphetamine where he admitted "that he may have harbored a predisposition to commit the charged offenses," *id.* at 433, 93 S.Ct. at 1643, and where the evidence confirmed that he was predisposed because he was involved in the illegal manufacturing of methamphetamine both before and after the undercover agent provided an essential ingredient for the manufacturing of the drug. The Court, *in dicta,* noted that "outrageous" law enforcement conduct might bar the government under due process principles from invoking judicial process to obtain a conviction. *Id.* at 431–32, 93 S.Ct. at 1642–43.

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), Hampton alleged that an undercover agent supplied him with drugs which were subsequently purchased by another government agent involved in the operation. Because Hampton admitted that he was predisposed to commit the crime, this Court and the Supreme Court, five-to-three, refused to consider the propriety of the agent's conduct and affirmed Hampton's conviction. Chief Justice Burger, and Justices White and Rehnquist, wrote that the due process bar to a conviction in an entrapment case is limited to situations in which the defendant is not predisposed. 425 U.S. at 488–90, 96 S.Ct. at 1649–50. However, Justices Powell and Blackmun, concurring in the judgment, and Justices Brennan, Stewart and Marshall, dissenting, determined that the due process protection against outrageous governmental conduct is available even when the defendant has been shown to be predisposed. Justice Stevens took no part in the consideration or decision of the case.

In sum, as we recently noted in *United States v. Lard,* 734 F.2d 1290 (8th Cir.1984):

[A]lthough the Supreme Court has sharply divided on the proper standard for applying the entrapment defense, it is generally agreed that "[t]he conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their

agents." * * * The key question is therefore whether the government agent caused or induced the defendant to commit a crime he was not otherwise predisposed—i.e., willing and ready—to commit whenever a propitious opportunity arose. *Id.* at 1293 (citations omitted).

We also held, in accordance with the prevailing case law, that the prosecution must prove a defendant's predisposition beyond a reasonable doubt. *Id.* at 1294 n. 3, (citing *United States v. French,* 683 F.2d 1189, 1191 n. 1 (8th Cir.)), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982); *United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

2. *Did the prosecution prove beyond a reasonable doubt that Lyle Dion was predisposed to take or sell an eagle?*

The government suggests that we eschew an examination of the myriad factors used by the courts to determine predisposition by arguing that Dion's predisposition is proven beyond a reasonable doubt solely because the undercover agents allegedly did nothing more than afford him the opportunity to sell an eagle to them. The government used this argument below in an attempt to keep the entrapment issue from the jury, and when the trial court rejected this, to convince the jury that Dion could not possibly have been entrapped.

We cannot agree with the government that its agents did nothing more than provide Lyle Dion with an opportunity to commit the crime as these terms have been construed by the courts. While Asa Primeaux, Sr., and Dwight Dion, Sr., readily responded to the government's offers to buy protected birds or their parts, Lyle Dion did not. Dion was first afforded an opportunity to receive a large sum of money for eagle parts on February 25, 1981, when Agent Mauldin visited his father's home and extended an offer of money for protected bird crafts to all who were present, including Lyle Dion. Dwight

Dion, Sr., testified that Mauldin had visited his home several times and that, in July of 1982, "he asked my boy, Lyle, if he can go out and get him some birds." Lyle also testified that Mauldin had asked him to kill eagles for him.

In addition to being directly solicited to kill and sell eagles, Lyle claims that he was indirectly induced to do so throughout 1981 and 1982, as word spread throughout the Yankton Reservation that Mauldin and Standish were offering big sums of money for protected bird feathers, crafts, and whole eagles. Lyle also suggests that during this nearly two-year period when money for protected bird feathers, crafts, and whole eagles. Lyle also suggests that during this nearly two-year period when his father was building a relationship of friendship and trust with Mauldin and receiving hundreds of dollars for protected bird crafts and offers of additional money for whole birds, his father encouraged him to kill an eagle for Mauldin.

We need not address here whether an individual can ever be indirectly entrapped through government inducements directed to him solely by an unwitting middleman[8] because the government agents not only indirectly solicited Dion to sell them an eagle, but they also directly extended to him at least one offer to purchase an eagle. The important point is not that this conduct by the government agents was necessarily outrageous,[9] but that Lyle was not merely given an opportunity to take or kill an eagle but was encouraged to do so by the agents' repeated direct and indirect solicitations over a nearly two-year period. *See United States v. Valencia*, 645 F.2d 1158 (2d Cir.1980). Under these circumstances, we cannot agree with the government that Lyle Dion readily and willingly responded to a mere opportunity to kill an eagle for profit.

In any event, determining whether Dion was predisposed requires an examination not only of the government's conduct, but more importantly of several factors which relate to Dion's character, background and state of mind. The government's suggestion that we should look only at the nature of the inducements offered is based on a sentence in *Sorrells* that "[i]t is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Id.*, 287 U.S. at 441, 53 S.Ct. at 212. However, the Court continued by saying that

---

**8.** *See, e.g., United States v. Valencia*, 645 F.2d 1158, 1168 (2d Cir.1980); *United States v. Anderton*, 629 F.2d 1044, 1047 (5th Cir.1980); *Johnson v. United States*, 317 F.2d 127, 128, 129 n. 1 (D.C.Cir.1963); Note, *Entrapment Through Unsuspecting Middlemen*, 95 Harv.L.Rev. 1122, 1129 n. 39 (1982).

**9.** The government began its investigation with a good lead on the individuals who were involved in protected bird trafficking in the Lake Andes area. Within six months, it had gathered enough evidence to prosecute those individuals who proved to be the main actors in the trafficking. Nonetheless, the government extended its operation for nearly two additional years. The recently formulated Attorney General's Guidelines on FBI Undercover Operations "attempt to minimize the possibility of overly persistent solicitation by limiting the duration of an undercover operation initially to six months." Gershman, *Abscam, The Judiciary, and the Ethics of Entrapment*, 91 Yale L.J. 1565, 1586 n. 100 (1982). The government, in its brief on appeal, has not explained its reasons for extending its operation for so long. Our review of the record suggests that the reason it did so was to prevent the unraveling of its undercover operations in other states and to attempt to detect the buyers of protected bird parts. In light of these considerations, we do not believe that the government's conduct was so outrageous that it amounts to a due process violation; however, we believe that we must make a searching examination into the "predisposition" of those Indians who were, at the later stages of "Operation Eagle," eventually tempted by the offers of large sums of money—which apparently, in the cases of some individuals, spelled the difference between having and not having heat and food. Although the government's extension of its undercover operation for an unusually extended period of time in an attempt to convict the buyers of protected birds properly recognizes that these buyers pose the greatest threat to protected wildlife, the consequence of this is that the longer and more involved the government became in buying protected birds and their parts, the greater the risk became that birds would be unnecessarily killed by individuals who would never have done so in the absence of the government's offers.

"[a]rtifice and stratagem may be employed to catch *those engaged in criminal enterprises,*" and that a "different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense[.]" *Id.* at 442, 53 S.Ct. at 212 (emphasis added). The Court cited with approval the principle enunciated by Circuit Judge Woods that "[i]t is well settled that decoys may be used to entrap *criminals,* and to present opportunity to one intending or willing to commit crime. *But decoys are not permissible to ensnare the innocent and law-abiding into the commission of crime.*" *Id.* at 445, 53 S.Ct. at 214 (emphasis added).

In determining whether Sorrells was predisposed, the Court looked not only at the nature of the agent's inducements, but also at whether "the act for which defendant was prosecuted was instigated by the prohibition agent," 287 U.S. at 441, 53 S.Ct. at 212, whether there was any evidence that Sorrells had ever sold liquor before, and whether Sorrells had a reputation as a law-abiding citizen. In its several later cases on entrapment, the Court has also engaged in a flexible, multi-factor analysis of predisposition. In *Sherman,* the Court looked to

the fact that Sherman was susceptible to the persistent solicitation of the government agent because he was an ex-addict undergoing rehabilitation, that there was no evidence that he was in the narcotics trade, that the agent played on his feigned friendship with Sherman, and that a search of Sherman's apartment after the arrest produced no narcotics. In *Lopez,* Lopez made a completely unsolicited bribe to the IRS agent. His conduct in the negotiations with the IRS agent also evidenced his predisposition. In *Russell,* Russell admitted that he might have been predisposed, and the evidence indicated that he was involved in manufacturing drugs both before and after the undercover agent assisted him. In *Hampton,* Hampton admitted that he was predisposed to commit the crime. A common strand throughout the cases is that a person is not predisposed if he is an "innocent" person who would not have committed the offense in the absence of the undercover agent's offer.

The lower courts have looked to a variety of factors in determining predisposition,[10] including: (1) whether the defendant readily responded to the inducement offered, *United States v. Hunt,* 749 F.2d 1078, 1085 (4th Cir.1984); (2) the circumstances sur-

---

**10.** Although we do not agree with the government that its agents merely afforded Dion an opportunity to commit the crime or that Dion readily responded to the agents' solicitations, we note that several courts have determined that predisposition is not necessarily proven solely by evidence that the defendant readily responded to an opportunity to commit a crime; instead, they have preferred to determine predisposition by reference to several factors in addition to the nature of the government's inducements and the defendant's response. *See, e.g., United States v. Becker,* 62 F.2d 1007, 1009 (2d Cir.1933) (Learned Hand, J.) ("We do not wish to commit ourselves to the doctrine that mere readiness is enough. * * * The whole [entrapment] doctrine derives from a spontaneous moral revulsion against using the powers of government to beguile innocent, though ductile, persons into lapses which they might otherwise resist. Such an emotion is out of place, *if they are already embarked in conduct morally indistinguishable, and of the same kind.*"); *U.S. v. Sherman,* 200 F.2d 880, 882 (2d Cir.1952) (Predisposition is present only where the accused was seeking "to realize his preexisting purpose"

and was "awaiting any propitious opportunity to commit the offense."); *United States v. Bower,* 575 F.2d 499 (5th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978) ("The Government's provision of aid, incentive, and opportunity for commission of the crime amounts to an entrapment only if it appears that the defendant has done that which he would never have done were it not for the inducement of Government operatives."). *See also State v. Luster,* 306 N.C. 566, 295 S.E.2d 421, 435–36 (1982) (Exum, J., dissenting) ("I am cognizant of the need for undercover 'sting' type operations in ferreting out crime. So long as these operations merely provide opportunity for persons *predisposed to criminal activity* to engage in it and be 'stung,' I applaud the officers for their energy and ingenuity. An operation, on the other hand, that encourages and incites criminal activity on the part of people who would otherwise have refrained from such activity has no place in the law enforcement arsenal. * * * Specifically, 'sting' operations such as [this one] must serve only to detect criminal activity and not instigate it." (emphasis added) ).

rounding the illegal conduct, *id.;* (3) " 'the state of mind of a defendant before government agents make any suggestion that he shall commit a crime,' " *id.,* citing *United States v. Williams,* 705 F.2d 603, 618 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 524–25, 78 L.Ed.2d 708 (1983); (4) whether the defendant was engaged in an existing course of conduct similar to the crime for which he is charged, *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); (5) whether the defendant had already formed the "design" to commit the crime for which he is charged, *id.;* (6) the defendant's reputation, *Russell,* 411 U.S. at 443, 93 S.Ct. at 1648 (Stewart, J., dissenting); *United States v. Groessel,* 440 F.2d 602 (5th Cir.), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 712 (1971); (7) the conduct of the defendant during the negotiations with the undercover agent, *United States v. Costello,* 483 F.2d 1366, 1368 (5th Cir.1973); (8) whether the defendant has refused to commit similar acts on other occasions, *Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967); (9) the nature of the crime charged, *United States v. Jannotti,* 673 F.2d at 604 (3d Cir.1982) (en banc) ("the very acceptance of a bribe [by a public official] * * * may be evidence of a predisposition to do so * *."); *United States v. Dickens,* 524 F.2d 441, 445 (5th Cir.1975), *cert. denied,* 424 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976) ("Ability of these defendants to supply large quantities of marijuana shortly after they had been requested to do so was pro-

bative evidence of predisposition."); *cf. Hampton,* 425 U.S. at 497 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J. and Blackman, J., concurring.) (One who buys or sells narcotics may have a more difficult burden in resisting the government's proof of predisposition); and (10) "[t]he degree of coercion present in the instigation law officers have contributed to the transaction" relative to the "defendant's criminal background," *United States v. Townsend,* 555 F.2d 152, 155 n. 7 (7th Cir.1977). In *United States v. Lard,* 734 F.2d at 1293, we relied on *Townsend* for the principle that, "[d]etermining a defendant's predisposition requires examination of the defendant's personal background to see 'where he sits on the continuum between the naive first offender and the streetwise habitue.' "

Dion argues that the application of several of these tests evidences his lack of predisposition. He claims, without refutation by the government, that he had never killed a protected bird before [11], had never been involved in making or selling protected bird crafts, had never had a desire to kill a protected bird before he was induced to do so by the government agents,[12] and believed it was against his Native American religious beliefs to shoot an eagle.

That he had never killed an eagle before December 1982 is particularly relevant under the government's claim that there was a market in the Lake Andes area for protected birds and their parts prior to the onset of "Operation Eagle," [13] because it

**11.** This is strongly supported by the tapes secretly made at the home of Dwight Dion, Sr., on December 13, 1982, and March 10, 1983. At the December 13 encounter, Dwight, evidencing his trust in Mauldin and Standish, freely responded to their question on how many eagles he killed a year by indicating that he killed as many as four. When Lyle Dion later arrived at his father's home with the tail feathers from an eagle, Dwight indicated that this was the first eagle Lyle had ever killed. Lyle confirmed this. Dwight suggested this once again at his March 10, 1983 meeting with the agents when he said that he was the only one in the area that he knew of who was killing eagles.

**12.** The government admitted at the trial below that it had never heard from any of its sources,

including Dion's father, Dwight Dion, Sr., that Lyle was involved in taking or selling protected birds or their parts.

**13.** Several Indians testified at the trials below that there was no market for protected birds before the government created the market. The government, however, argued that there was a market and that it had prosecuted at least one buyer. It also suggested that Dwight Dion, Sr., had ready access to a buyer in Minnesota and to buyers in the Southwest United States. Although the evidence reflects that the government agents were the major buyers of protected birds and their parts in the Lake Andes area throughout the 1981–83 period, we must resolve the evidentiary conflict in favor of the jury's

reveals that Lyle had the opportunity to kill and sell eagles for profit before the onset of "Operation Eagle," but had never done so. Thus, the evidence suggests that Dion was not ready and willing to take and sell an eagle whenever a propitious opportunity arose.

Lyle's lack of predisposition is also evidenced by his conduct during the negotiations with the government agents for sale of the eagle tail feathers and carcass. Our review of the tape of December 13, 1982, strongly indicates that Lyle Dion is not a "streetwise criminal" but instead is a "naive first offender."[14] *See Lard,* 734 F.2d at 1293. He seemed to know nothing about the protected bird trade and indicated that he had no idea how to price an eagle. He had to ask his father how much he thought an eagle would sell for. His attitude also reflects that of an unwary and innocent adolescent drawn into the agents' trap through their "friendship" with his father and the large amount of money offered.

Next, when the agents asked Lyle if they could buy the rest of the eagle, he declined to sell it to them, indicating that he had given it to his "brother-in-law" for a religious ceremony. Lyle finally agreed to retrieve the rest of the eagle only after the agents repeatedly requested that he do so. Additional evidence of Dion's lack of predisposition is that he never again sold an eagle to government agents or to anyone else.

Finally, we believe that the government's offer of a substantial sum of money for protected birds or their parts over the nearly two-year period before Dion became involved reflects a lack of predisposition when considered against his lack of sophistication and his severe poverty. We agree, of course, that an individual cannot claim that he was entrapped simply because he was poor and could not resist the substantial sums of money to be made through criminal activity. For example, in *United States v. Jannotti,* 673 F.2d 578 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), the Court, refused to decide whether "the dollar amount offered [is] relevant to disprove predisposition," *id.* at 599, but noted that $30,000 is not "so large or generous as to overcome an official's natural reluctance to accept a bribe." *Id.* As a general matter, we also agree with the Tenth Circuit's conclusion in *United States v. Lambinus,* 747 F.2d 592, 598 (10th Cir.1984), that one's poor financial condition and difficulty in finding a job may not, in the vast majority of cases, be relevant to the question of whether he was entrapped. Thus, because of other evidence of their predisposition, neither Dwight Dion, Sr., or Asa Primeaux, Sr., could claim entrapment simply because they were so poor they could not resist the chance to make some money.

However, in some cases, it may be that the unusual poverty of the defendant or other problems peculiar to the defendant must be considered in determining predisposition. In *Sherman v. United States,* 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958), for example, the Court emphasized the government's exploitation of the weakness of the defendant, who was trying to overcome a narcotics habit. Justice Frankfurter, concurring, condemned "[a]ppeals to sympathy, friendship, [and] the possibility of exorbitant gain." *Id.* at 383, 78 S.Ct. at 826.

In this case, the government agents came upon an extremely impoverished Indian Reservation in a desolate area of South Dakota where, according to some of the witnesses at the trial below, life is for many Indians, a mere question of simple survival. The risk for the government in offering so much money to these individuals over a nearly two-and-one-half year pe-

---

verdict and thus conclude that, prior to the onset of "Operation Eagle," there was a private market for eagles in the Lake Andes area, at least for the Dion and Primeaux families.

14. We also note that there is no record evidence that Dion has ever previously been convicted of any crime. Additionally, the government does not contest his claim of a good reputation as a law-abiding individual.

riod was that many who would never have shot a protected bird would be enticed into doing so.

In sum, we recognize this is a close and difficult question. Viewing the evidence in the light most favorable to the government, we find a lack of evidence that Dion was predisposed to kill and sell eagles and significant evidence that he was not predisposed. If we are to give any meaning to the reasonable doubt standard, we cannot conclude that a reasonable jury could have found beyond a reasonable doubt that Dion was predisposed. Accordingly, we hold that he was entrapped and reverse his convictions on both counts.

### C. Terry Fool Bull.

Fool Bull was convicted of one count of "taking" a bald eagle in violation of the ESA, 16 U.S.C. §§ 1538(a)(1)(B) and 1540(b)(1), and one count of offering for sale and selling a bald eagle in violation of the MBTA, 16 U.S.C. §§ 703 and 707. For reversal, he argues that the district court erred in: (1) allowing copies of the transcript of a tape recording to be furnished to the jurors in the jury room even though the parties had not stipulated to their accuracy or agreed to their use as evidence; (2) not instructing the jury that, to convict Fool Bull of "taking" a bald eagle, they must find that the eagle was alive at the time of the taking; (3) not setting aside the verdict and dismissing the indictment because of selective prosecution; and (4) not granting his motion for judgment of acquittal because the evidence presented at trial established as a matter of law that he was entrapped by government agents into taking and selling a bald eagle. Although we agree that Fool Bull's transcript claim may have merit under *United States v. McMillan,* 508 F.2d 101 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), we need not reach this issue or the remaining issues because we agree that he was entrapped as a matter of law.

In our discussion of Lyle Dion's claim of entrapment, we set forth the standards governing a claim of entrapment. Fool Bull claims, without contradiction, that he had never killed or sold a protected bird or their parts before he was induced to do so in March of 1983 by direct and indirect government offers of a substantial amount of money over two years for a protected bird. He claims that he has never shot any bird or animal in the last five years, and has never owned a gun. He also notes that he has never been convicted of any crime, and has a good reputation as a law-abiding citizen. He was unemployed for much of the period of time when "Operation Eagle" was conducted, and he supports himself his family on $268 in assistance each month. He and his family live in a dilapidated trailer next door to his father-in-law, Asa Primeaux, Sr.

He claims that he first had contact with FWS agent Mauldin in 1981 when he observed Mauldin purchasing Indian crafts from several Indians and offering to buy any protected bird items the Indians could produce. He did not respond to Mauldin's offer at this time. In the late summer of 1982, he learned from Asa Primeaux, Jr. and Sr., that Mauldin and Standish were offering $750 for eagles. He claims that his father-in-law, Asa Primeaux, Sr., who was receiving several thousand dollars from the agents for protected birds and their parts, was acting as the unwitting agent of Mauldin and Standish by repeatedly encouraging him to be on the lookout for eagles or other protected birds.

Fool Bull claims that in early March, 1983, more than two years after "Operation Eagle" began, he discovered an eagle which had been killed by a shotgun blast. Fool Bull alleges that he told his father-in-law, Asa Primeaux, Sr., about the eagle, and Asa encouraged him to sell it to agent Standish. Asa called Standish and told him that his son-in-law, Terry Fool Bull, had an eagle for sale. This was the first time that any FWS agent had heard anything about Fool Bull's involvement in the protected bird trade.

Shortly thereafter, Standish and Mauldin came to the residence of Asa Primeaux,

Sr., who showed the agents a frozen eagle and offered it for sale. By this time, Fool Bull had arrived and Standish paid Fool Bull $650 for the eagle. This was the agents' only transaction with Fool Bull. The tape of this transaction reflects that Fool Bull had never sold a protected bird before and was quite naive as to the proper price for an eagle and what the "traders" would do with it.

In sum, Fool Bull claims that he was not predisposed to take or sell an eagle or other protected birds or their parts, that he was not ready and willing to do so whenever an opportunity arose, but that he was entrapped into taking and selling the eagle by Mauldin's direct offer of money for protected bird parts on one occasion and Mauldin's and Standish's repeated indirect offers of large sums of money for an eagle. The government contends that it did no more than offer Fool Bull an opportunity to commit the crime; otherwise, however, the government does not point to a single piece of evidence that Fool Bull was predisposed to commit the crime.

As we noted with respect to Lyle Dion, the fact that Fool Bull had never killed or sold an eagle before despite the market for these birds on the reservation (according to the government), reflects that he was not "ready and willing" to do so whenever a propitious opportunity arose. We are concerned that there is a great likelihood that Fool Bull was not predisposed to take or sell an eagle, but that his actions were completely the result of a government undercover operation which had carried on too long. By the spring of 1983, the government had conducted its undercover operation for over two years. It had started the operation with a good lead on which individuals in the Lake Andes area were killing and selling protected birds and their parts, and it quickly collected a substantial amount of evidence on these individuals and others who were engaging in this practice before the onset of "Operation Eagle." If the government wished to continue the operation for an additional two years, it had to take into account the risk that its offer of substantial sums of money to im-poverished Indians for birds and bird parts might encourage the "unwary innocent," *Sherman,* 356 U.S. at 372, 78 S.Ct. at 821, to take and sell protected birds. As we stated in *Lard,*

> [w]e recognize that the entrapment defense is a "relatively limited defense" and does not give the federal judiciary a "chancellor's foot" veto over those law enforcement practices with which it may not completely agree. *Russell,* 411 U.S. at 435 [93 S.Ct. at 1644]. *Hampton,* 425 U.S. at 490 [96 S.Ct. at 1650]. We also recognize that infiltration of criminal operations by undercover agents is an accepted and necessary practice, particularly in combatting an ever-expanding narcotics traffic. *See Hampton,* 425 U.S. at 495–96 n. 6 [96 S.Ct. at 1652–53 n. 6] (J. Powell, concurring); *see also Jannotti,* 673 F.2d 578 (undercover operations—including inducements—needed to discover and expose corruptible public officials). However, the line must be drawn where, as here, a government agent lures the unwary innocent and then implants a law-breaking disposition that was not theretofore present. In such cases, the government takes on the unwholesome appearance of the consummate manufacturer of crime. The continuing vitality and integrity of our "government of laws" would be imperiled if we sanctioned the manufacturing of crime by those responsible for upholding and enforcing the law. As Mr. Justice Frankfurter stated in *Sherman,* 356 U.S. at 384 [78 S.Ct. at 826]: "The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime."

*Id.,* at 1296.

■ Viewing the evidence in the light most favorable to the government, we con-

clude that the evidence shows that Fool Bull was entrapped as a matter of law. No reasonable jury could have found beyond a reasonable doubt that Fool Bull was ready and willing to commit the crimes, and that the agents did no more than afford him an opportunity to do so. We therefore reverse Fool Bull's convictions on both Counts I and II of the indictment.

### D. Asa Primeaux, Sr.

■ Asa Primeaux, Sr., was convicted of eight counts of violating the BGEA, 16 U.S.C. § 668(a), the MBTA, 16 U.S.C. §§ 703 and 707, and the ESA, 16 U.S.C. §§ 1538(a)(1)(B) and 1540(b)(1). For reversal, Primeaux contends:[15] (1) that the trial court's denial of his motion for a continuance violated his sixth amendment right to effective assistance of counsel; (2) that his sixth amendment right to an impartial jury was violated because a majority of the veniremen had previously sat as potential jurors in similar prosecutions under "Operation Eagle;" (3) that his sixth amendment right to an impartial jury was violated because the trial court on voir dire refused to permit counsel's questions on the bias of the veniremen toward the offenses charged and the defense of entrapment. We find that these claims lack merit and we affirm Primeaux's convictions on all eight counts.

We do not agree with Primeaux's first claim that he was denied effective assistance of counsel because the trial court denied his motion for a continuance made six days before trial. The record reveals that Primeaux's counsel, John N. Gridley, had more than three months to investigate and prepare for trial, and reveals that during this time, Gridley investigated the law and facts of the case and filed sixteen pretrial motions, including two motions for continuance, the first of which was granted. Six days before trial, Gridley filed the second motion for continuance on the ground Primeaux wished to use a new volunteer counsel, who needed additional time to prepare. The court denied the motion.

Primeaux's argument on appeal relies on two cases. First, he cites *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), for the proposition that a "defendant should be afforded a fair opportunity to secure counsel of his own choice." *Id.*, 287 U.S. at 53, 53 S.Ct. at 58, 77 L.Ed. at 162. We agree with this statement of the law, but the record reveals that Primeaux did have a fair opportunity to secure counsel of his choice. Gridley acted as counsel for three months, and Primeaux expressed no dissatisfaction with his services. Indeed, Gridley is counsel for Primeaux on this appeal.

Primeaux next cites *Wolf v. Britton*, 509 F.2d 304 (8th Cir.1975), for the proposition that defense counsel must be given a fair opportunity to prepare his case. In that

---

**15.** Primeaux claimed at his trial that he had been entrapped. He does not, however, raise this claim on appeal. In light of our disposition of the entrapment claims of Lyle Dion and Terry Fool Bull, we have also reviewed Primeaux's claim of entrapment. We find that Primeaux does not have a claim of entrapment as a matter of law. His case is distinguishable from the cases of Lyle Dion and Terry Fool Bull on several grounds. Primeaux, unlike Dion and Fool Bull, became involved in "Operation Eagle" very early on. On the first day that agent Mauldin arrived in South Dakota, Primeaux sold to Mauldin Indian fans made from protected bird feathers. Over the next two years, Primeaux, on several occasions, sold to Mauldin protected bird parts or the birds themselves.

Like Fool Bull and Dion, Primeaux claimed that because he was very poor, he could not resist the government's offer of large sums of money for protected bird feathers. This is not enough to make out a claim of entrapment. Unlike the situation in the cases of Dion and Fool Bull, in Primeaux's case, "Operation Eagle" quickly led to him as an individual who was involved in making crafts from protected bird feathers, and possibly involved in selling these items commercially. There was no evidence of predisposition in the cases of Dion and Fool Bull, but at least some evidence of predisposition in Primeaux's case. We are not troubled in Primeaux's case, as we are in Dion's case and Fool Bull's case, that the crimes committed were purely the result of the "creative activity" of the government, or that Primeaux was an "unwary innocent" entrapped into committing a crime by an undercover operation which offered too much money to impoverished Indians over too long a period of time, such that persons who would otherwise have obeyed the law were eventually enticed into breaking it.

case, we found a denial of effective assistance of counsel where the initial appointment of defense counsel was made one and one-half days before the commencement of trial. This is a far cry from the case at hand, where the initial appointment of defense counsel was made well over three months before trial and where the defendant received one continuance and then first expressed a desire for new counsel six days before trial.

Finally, to prove that he was denied effective assistance of counsel, a defendant must prove that

counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* —— U.S. ——, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

Primeaux has not met this standard. He gives no indication what his counsel was unable to do at trial that a continuance would have allowed him to do. The record reveals that Primeaux was ably represented at trial, and was only convicted of eight counts on the fourteen-count indictment. We find no abuse of discretion in the district court's denial of the motion for continuance and no violation of Primeaux's sixth amendment right to effective assistance of counsel.

Primeaux's second argument for reversal is that he was denied his sixth amendment right to a fair and impartial jury because the jury panel from which his petit jury was selected consisted of veniremen who had sat as potential jurors in other prosecutions arising out of "Operation Eagle." However, the record reveals that any and all of the potential jurors called for this case who had actually sat on prior "Operation Eagle" juries were excused and released by the trial court.

Primeaux's claim fails because the mere selection of jurors from panels who may have previously participated in voir dire, even in a similar case, is not error, *United States v. Williams,* 484 F.2d 176, 178 (8th Cir.), *cert. denied,* 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 476 (1973); *United States v. Jones,* 486 F.2d 476, 477–78 (8th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1415, 39 L.Ed.2d 472 (1974), unless actual bias is shown. *United States v. Franklin,* 700 F.2d 1241, 1242 (10th Cir. 1983).

The cases cited by Primeaux are inapposite. In *Leonard v. United States,* 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964), the Court reversed defendant's conviction where jurors had sat in open court and listened to another jury return a guilty verdict against the same defendant whom they then proceeded to try on charges almost identical to those on which they had seen him convicted. In *Everett v. United States,* 281 F.2d 429, 438 (5th Cir.1960), the Court found reversible error where the trial court allowed eight of the jurors who had served as jurors in a codefendant's case, and who had been complimented by the court for their promptness in returning guilty verdicts, to sit on the defendant's case. In *Lett v. United States,* 15 F.2d 690 (8th Cir.1926), the Court ordered a new trial where eight members of Lett's jury were jurors on the panel which convicted Lett's wife that same day.

In Primeaux's case, all of the potential jurors seated for voir dire were asked if they knew the defendant or had ever heard his name before. Only one responded positively and was excused. The potential jurors were also asked whether they had heard of "Operation Eagle" and whether this would influence them. All jurors who responded that they would

be influenced by what they heard or thought about the case were excused for cause. The jurors were further questioned by defense counsel whether they had formed any opinion about the defendant or any of the other cases they had been questioned about and they gave negative responses. In sum, we find no error because Primeaux has failed to show that any of the petit jurors in his case were in any way biased.

■■■■■■ Primeaux's final argument for reversal is that his sixth amendment right to an impartial jury was violated because the court refused to allow questions on voir dire designed to elicit bias of veniremen toward the offenses charged or the defense of entrapment. The general rule is that, while a district judge should allow a lawyer a full opportunity to question jurors about how factors which will be revealed by the evidence will influence them,[16] a district judge has substantial discretion in determining the form and scope of voir dire, Fed.R.Crim.P. 24(a); *Rosales-Lopez v. United States,* 451 U.S. 182, 187, 188–89, 101 S.Ct. 1629, 1633, 1634–35, 68 L.Ed.2d 22 (1981); *United States v. Cassel,* 668 F.2d 969 (8th Cir.), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1348 (1982), and will be reversed only for an abuse of discretion and where substantial prejudice to the defendant is created. *Id.,* at 971; *United States v. Drefke,* 707 F.2d 978 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983).

■■■■ The trial court allowed extensive voir dire in this case. The court's questioning covers eighteen pages of the trial transcript, the government's questioning covers twelve pages, and the defendant's questioning covers 71 pages. Having reviewed these pages of transcript and the arguments of the parties, we find that the court allowed adequate voir dire. If we were

sitting as a trial court, we might have allowed additional questioning by the defendant, but we cannot agree that the trial court abused its discretion or that Primeaux has suffered substantial prejudice. Accordingly, we affirm Primeaux's convictions on all eight counts.

## II. CONCLUSION.

First, with respect to Dwight Dion, Sr., we affirm his convictions on Counts III, IV, V, VI, IX, XI, XIII and XIV. We also find no error under the allegations of error before this panel with respect to Counts VIII and X; however, these counts are vacated pursuant to the opinion of this Court *en banc.* Count XII against Dion is not before this panel; the Court *en banc* affirmed the trial court's dismissal of this count.

Second, with respect to Lyle Dion, we reverse his convictions on both Counts I and II of the indictment. Accordingly, this Court's *en banc* opinion, vacating Count I of the indictment on the treaty defense, is of no effect because we reverse Dion's conviction on Count I outright.

Third, with respect to Terry Fool Bull, we reverse his convictions on both Counts I and II of the indictment.

Finally, we affirm the convictions of Asa Primeaux, Sr., on Counts I, IV, V, VI, VII, VIII, XI and XIV of the indictment.

---

**16.** Additionally, as the Supreme Court recently noted:

"We reiterate what this Court stressed in *Dennis v. United States,* 339 U.S. 162, 168 [70 S.Ct. 519, 521, 94 L.Ed. 734] (1950): "[T]he trial court has a serious duty to determine the question of actual bias, and a broad discretion in its ruling on challenges therefor. * * * In exercising its discretion, the trial court must be zealous to protect the rights of an accused." *Wainwright v. Witt,* —— U.S. ——, ——, 105 S.Ct. 844, 855, 83 L.Ed.2d 841, 855 (1985).